Kenneth LEHRMAN, Plaintiff-Appellee,

v.

GULF OIL CORPORATION, Defendant-Appellant.

No. 29908.

United States Court of Appeals,
Fifth Circuit.

March 15, 1972.

As Modified on Denial of Rehearing and Rehearing En Banc June 26, 1972.

John B. McNamara, Jr., Waco, Tex., W. B. Edwards, Regional Atty., Gulf Oil Corp., Houston, Tex., for defendant-appellant.

Jack N. Price, Longview, Tex., Charles M. McDonald, Waco, Tex., for plaintiff-appellee.

Before WISDOM and COLEMAN, Circuit Judges, and BOYLE,* District Judge.

WISDOM, Circuit Judge:

This appeal from a treble damage judgment under the Sherman Act raises questions of jurisdiction, liability, and the proper measure of the plaintiff Lehrman's damages. We affirm the judgment of the district court as to jurisdiction and liability, but reverse and remand for additional proceedings on the question of damages.

Gulf Oil Corporation took this appeal from a jury verdict and judgment of the United States District Court for the Western District of Texas awarding $63,000 plus costs and interest to Kenneth Lehrman, the operator of a now-defunct Gulf service station in Mart, Texas. Lehrman sued Gulf for treble damages under Section 1 of the Sherman Act, 15 U.S.C. § 1, alleging that Gulf's complicated system of setting wholesale prices for its gasoline was used by Gulf as a mechanism for fixing the retail prices at which dealers resold Gulf gasoline. Gulf asserts that Lehrman voluntarily retired because he was not making enough money to continue in business. Lehrman complains that Gulf's pricing policies drove him out of business by making it impossible for him to engage in price competition with a neighboring self-service station run by Cape Oil Company, and with stations in Waco, Texas, near Mart. At the time of the trial he was a mail carrier. Both parties to the appeal complain of the district court's handling of the damages to be assessed against Gulf.

I.

THE FACTS

Lehrman opened his service station, leased from Gulf, in November 1959. It was the only service station handling Gulf gasoline in Mart, Texas, a small town in central Texas. For almost nine years he sold on the average between 8000 and 9000 gallons a month. See footnote 14.

From December 12, 1961, until August 16, 1964, Gulf openly fixed the resale prices for its gasoline, relying upon "consignment" agreements with its retail outlets as a means of avoiding the Sherman Act's per se ban on vertical agreements not to resell except at a fixed price. The "consignment" charade came to an abrupt end in the wake of the Supreme Court's ruling in Simpson v. Union Oil Co. of California, 1964, 377 U.S. 13, 84 S. Ct. 1051, 12 L.Ed.2d 98. Gulf then put into effect a "price support" system of wholesale distribution of its gasoline. That system was in effect at the time Lehrman's station went out of business in 1967, and the uncontroverted evidence at trial indicates that the price support system continues to characterize a substantial portion of Gulf's operations. This litigation requires us to analyze the compatibility of Gulf's price support system with the competitive dictates of our antitrust laws.

Gulf sells gasoline to its dealers at a "dealers tank wagon" ("DTW") price. That price is set from 4.5 to 5 cents lower than the prevailing retail price on the gasoline in question; the difference of 4.5 to 5 cents provides the dealer with his gross margin of profit on the sale of each gallon of gasoline. For example, if the retail posting on Gulftane were 29.9 cents, the "dealer margin" would be 5 cents per gallon and the DTW price would be 24.9 cents per gallon.

When other major oil companies in competition with a Gulf station lower their prices, a dealer requests Gulf to provide "price support" in the form of a "temporary competitive allowance" ("TCA"), or reduction in the DTW price. After ascertaining informally that the competitor station's prices are as described by the Gulf dealer, Gulf grants the necessary TCA. For example, suppose that Texaco were selling its competitive gasoline for 25.9 cents per gallon in a location adjoining a Gulf station which

---

* Hon. Edward J. Boyle, Sr., U. S. District Judge, sitting by designation.

had posted Gulftane at 29.9 cents. A 3.5 cent TCA would be granted. If the dealer followed Gulf's "suggested" retail price, he would post Gulftane at 25.9 and absorb half a cent of the retail price cut, reducing his gross margin to 4.5 cents and the DTW price to 21.4 cents per gallon.

To understand Lehrman's necessary reliance on this system, we must add a further complication to the Gulf price support system—namely, Gulf's insistence upon differentiating the prices it will support in the face of "private brand" and "self-serve" competition from the prices it will support to meet the competition of other major oil companies.[1] Gulf will support a price only to within a penny of a "private brander" and—directly relevant to this case—only to within two cents of a self-serve station. In other words, if Lehrman wished to price his gas at the precise level charged by the self-serve Cape Oil station in Mart, he might have done so, but would have been forced to absorb the two cent difference out of his own gross margin of profit—assuming, that is, that Gulf would not withdraw *all* price support from Lehrman if he dipped beneath Gulf's suggested retail price.

This outline of the TCA mechanism provides the background for the events which Lehrman alleges led to the failure of his service station business. Mart, where Lehrman's station was located, is only twenty miles from Waco, a relatively large city with a number of major company service stations. Since many residents of Mart work in Waco, they may compare Mart prices with Waco prices and lighten competition between major company outlets in the two locations. Prices in Mart were consistently higher than those charged in Waco, but in 1964 Lehrman was able to compete with the Waco stations for a time because Gulf was granting him regular allowances to permit him to keep pace with the self-serve Cape Oil station in Mart which had opened in the late months of 1963.[2] Indeed, it appears from the record that Lehrman's chief concern with the self-serve station in Mart was as a vehicle to enable him to secure pricing competitive with dealers in Waco and Harrison Switch.

In early 1965 Durst, a Cape Oil representative, called Stokes, Gulf's district manager, and complained that Lehrman was posting Gulftane too cheaply—within a penny, and not two cents, of the self-serve station's prices. After this complaint from Lehrman's competitor, Gulf never again granted significant price support to Lehrman.[3] The result was

---

1. As we remarked in a previous antitrust appeal involving retail petroleum distribution, "The line between a 'major' and a 'non-major' oil company or 'independent' is not well-defined. A major oil company is usually integrated in that it operates on the four functional levels of production, transportation, refining, and marketing. Generally, a non-major does not own its refinery, or if it does, the refinery is usually small. The non-major usually owns and operates its filling station." Sun Oil Co. v. FTC, 1961, 294 F.2d 465, 467, n. 3, rev'd on other grounds, 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466.

2. At the trial, Lehrman described his use of the TCA's during 1964 as follows:

A Well, during 1964 when the Save Station had come in, about, I would say, toward the latter part of the year, two or three different times, as the price was going down, if Gulf would support 26.9, I would post 24.9. This would enable—the Save would drop his down to 23, and the second call that I made to Gulf, I would tell them that he was 23, and they would authorize me to go to 24, and then I would put mine on 22, and then he would go to 21.

Q And what would happen when it went to 21?

A Well, he would—I would have to call one more time to get it down to where Save would go to 20.9, and I ended up on 21.9 on my Gulftane gasoline. That was the lowest that—Mr. Stokes said that was the lowest the Tyler District was authorized to go without a *call* to Houston, I believe.

3. Lehrman himself testified that after the conversation between Durst and Stokes he did not receive any more price support. Stokes, however, testified that Lehrman had continued to receive an allowance of

that his retail prices rose to two or three cents above those charged by the self-serve station, which were in turn higher than Waco prices. In short, after Durst complained that Gulf was granting TCAs enabling Lehrman to price his gasoline too cheaply, Gulf sharply curtailed its allowances to Lehrman. He could not compete with the Waco stations and still pay the wholesale prices demanded of him by Gulf. In 1967, upon sustaining a sizable net loss, Lehrman went out of business.

## II.
## JURISDICTION

At the outset, we are met with Gulf's contention that the lower court lacked subject matter jurisdiction over this case. Gulf says that its actions of which Lehrman complains, neither occurred in commerce nor had a "substantial adverse effect on interstate commerce", and that Lehrman therefore failed to make out a valid claim under the Sherman Act.[4] In support of its position, Gulf points out that although the crude oil from which the gasoline was made was produced 85 percent in Texas and 15 percent in Louisiana, the gasoline sold to Lehrman was manufactured entirely in Texas and once placed in the pipeline, never left Texas. Lehrman sold so little gasoline compared with Gulf's Texas and American sales

that Lehrman's sales and Gulf's relations with Lehrman had only a "de minimis" effect on interstate commerce.

Without so deciding, we assume Gulf is correct in its contentions that gasoline sold by Lehrman never moved in interstate commerce before Lehrman sold it and that his gasoline sales were small relative to Gulf's national and state-wide totals. By the same token, we take it to be true that Gulf's TCA system is in effect throughout much of the Southwest and that this system does have a significant effect upon the distribution of large amounts of gasoline, some of which, of course, moves in interstate commerce before it is sold as well as after. There is evidence in the record to support this proposition and none to contradict it.

Lehrman has consistently asserted that the TCA system of pricing is in effect beyond his own operation and far beyond the Mart-Waco area, and that this broad focus is the proper one for a jurisdictional determination in this treble damage action. Gulf, however, would have us concentrate for purposes of determining jurisdiction upon the volume of the business of the specific individual who complains of anti-trust violation. The jurisdictional problem in this case, then, reduces to whether a business practice, benign on its face, with an undeniably powerful effect on interstate

.18 cents per gallon, even after Durst complained to Stokes about Lehrman's pricing policies. The .18 cents per gallon was apparently in effect throughout the Tyler area. Despite this qualification, Stokes did not deny that Gulf had severely restricted the amount and frequency of its TCA's to Lehrman in the wake of the Durst complaint. Stokes was asked whether Durst's complaint concerned him.
A. Yes, it was of concern when he told me that, because I could see I had been giving away Gulf's money down there pretty regularly.
Q. Now what do you mean by that, sir?
A. Granting allowances that were too large. I got to thinking about it.
 * * * * *
Q. And so is that why you stopped granting the temporary competitive allowances that had previously been in effect for Mart?

A. What I stopped doing was granting allowances that would allow Lehrman a supported price of one cent above the self-serve.

4. "Every contract combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." 15 U. S.C. § 1.
"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

commerce, may be the subject of a treble damage suit by a single entrepreneur, inspired by coercive application of the practice, whose own operation is relatively small and whose individual effect on interstate commerce is insignificant.

A. The Supreme Court considered a similar question in Simpson v. Union Oil, *supra*, where a single gasoline station operator successfully complained of price-fixing under a lease-consignment agreement which Union conceded was extensively used in eight Western states. Without any discussion of the volume of Simpson's own business, the Court had no trouble finding jurisdiction. It stated, though without elaboration, that "there is actionable wrong whenever *the restraint of trade or monopolistic practice* has an impact on the market; and *it matters not* that the complainant may be only one merchant". 377 U.S. at 16, 84 S.Ct. at 1054, 12 L.Ed.2d at 102 (emphasis added). *Cf.* Klor's v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 213, 79 S.Ct. 705, 3 L.Ed.2d 741, 745.

Gulf argues that *Simpson* is distinguishable from the present case. First, Simpson's gasoline may have originated outside California. As a result, Simpson's own business arguably had an effect on interstate commerce that was not insubstantial. But the forthright language of *Simpson*, quoted just above, is incompatible with this restrictive interpretation.[5] Moreover, there is simply no mention in the *Simpson* opinion of Simpson's individual impact on interstate commerce.

Gulf's second argument is more troublesome. Gulf contends that *Simpson*, unlike the present case,[6] holds only that a single, intrastate operator may sue in treble damages if he is the victim of a broadly-utilized practice whose adverse effect on competition may be determined *on its face*. In *Simpson*, the anticompetitive vices of the lease-consignment system of retail distribution were uniform throughout the Union Oil distribution network. Here, Gulf says, we deal with a facially benign business practice, not uniform throughout the area of its use, and subject to abuse only on a case-by-case basis—subject to abuse, that is, only *as applied*. Thus the TCA pricing system is arguably a "combination, contract, or conspiracy" in restraint of Lehrman's trade only—by hypothesis, not "trade . . . among the several States."

We decline Gulf's invitation to read *Simpson* narrowly; we consider its treatment of Lehrman and the harm to the nation's commerce that would be threatened by allowing Gulf's behavior to go uncorrected. The TCA network throughout the Southwest (indeed, throughout the rest of the United States) constituted the applicable "contract, combination, or conspiracy" of Gulf with its retailers and with its competitor Cape Oil Company. (See Part III, *infra*.) Because of the broad scope of the TCA mechanism, however inherently compatible with competition, the treatment of Lehrman when he disobeyed Gulf's price "suggestions" transformed a practice benign on its face into a coercive practice with untold geographical potential for deterring Gulf retailers from freely determining their own retail prices and for reassuring Cape Oil of Gulf's resolve to enforce Gulf's "suggested" prices. In short, after the events giving rise to this litigation, Gulf

---

5. See also Fortner Enterprises, Inc. v. United States Steel Corp., 1969, 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed. 2d 495, 504:

"For purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice, . . . the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit."

6. In Part III of this opinion, *infra*, we do not hold the TCA system bad "on its face", but only "as applied" to Lehrman. In other words, each Gulf station operator who asserts that his prices have been fixed, to his detriment, by the TCA mechanism will have to persuade the jury that the system was in fact used coercively towards him.

had injected into its TCA pricing mechanism a threat to secure compliance with suggested retail prices. The means for securing such compliance went well beyond "mere announcement of [Gulf's] policy and the simple refusal to deal" if the suggested prices were not adhered to. United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed.2d 505, 515. Whether or not Gulf might actually enforce its threat to treat other retail price cutters in its distribution system as it dealt with Lehrman, the threat to do so was there and took its coercive toll as surely as if it had been written into a contract as in *Simpson*.

If, then, the TCA system as a whole provides us with jurisdiction as a "contract, combination or conspiracy . . . in restraint of trade between the States", another question arises: how does the system as a whole escape condemnation under the Sherman Act? The TCA system is, and always will be, a "contract, combination, or conspiracy." It is, however, a "contract, combination, or conspiracy . . . in restraint of trade . . . among the several States," only insofar as and at such times as Gulf couples the TCA system with a credible threat to vary dealer TCA's as a means of coercing obedience to a Gulf-determined schedule of retail prices. This threat was credible and outstanding in the wake of Gulf's treatment of Lehrman; at the time Lehrman brought suit, the TCA system operated as a widespread conspiracy in restraint of trade and Lehrman had been injured "by reason of" the TCA system. In short, then, the TCA system as a whole furnishes a jurisdictional handle because the system, in all its area of application, was a coercive device for resale price maintenance; yet the system as a whole need not be condemned as anti-competitive since it was only Gulf's actions toward Lehrman that infected the system with its credible threat of reprisals for disobedience.

Today's jurisdictional basis is compelled by the policies of the Sherman Act and, in particular, by the reasons for the treble damage remedy. It would be exceedingly unfortunate if large enterprises could, without federal antitrust scrutiny, use small, intrastate operators as a way of making known certain unspoken and unwritten features of broadly utilized business practices which are not anticompetitive on their face. In other words, from a pragmatic view, it is impossible to ignore the impact of a supplier's conduct towards one or more wholly intrastate retailers on the supplier's dealings with all his retailers, intrastate and interstate. See Schulman v. Burlington Industries, Inc., S.D.N.Y. 1966, 255 F.Supp. 847, 852; Burkhead v. Phillips Petroleum Co., N.D.Cal.1970, 308 F.Supp. 120, 124.

It is clear from *Simpson* that a single, intrastate dealer may sue in treble damages if he is the victim of a broad practice whose adverse effect on competition may be determined on its face. The suit is allowed because "Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but to vindicate the important public interest in free competition." Fortner, *supra*, 394 U.S. at 502, 89 S.Ct. at 1258, 22 L.Ed.2d at 504; Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir. 1954, 214 F.2d 891, 893. "As applied" anticompetitive practices are equally inimical to the public interest in free competition. If anything, the need for multiplying enforcement agencies to make the antitrust laws more effective is more acute in the intrastate, "as applied" situation presented today than in the "on its face" situation in *Simpson*. The threat to competition is as great as in the "as applied" anticompetitive situation, for the practical control over prices through fear of reprisal in the one case approximates outright contractual control in the other. Yet detection of the coercion and control is far more subtle and its detection more difficult in the "as applied" situation.

There is, of course, no constitutional barrier to jurisdiction founded upon the rationale asserted by Lehr-

man. Interstate commerce "is a practical conception", and as a result "interferences with that commerce must be appraised by a judgment that does not ignore actual experience." NLRB v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 41–42, 57 S.Ct. 615, 626, 81 L.Ed. 893, 914. A wide-ranging business practice of the kind engaged in by Gulf undoubtedly affects the nation's commerce. As such, it is within the power of Congress to regulate; and the power to regulate commerce is the power to enact "all appropriate legislation" for "its protection and advancement." The Daniel Ball, 10 Wall. 557, 564, 19 L.Ed. 999, 1001. Thus Congress would surely have the power to legislate directly in control or prevention of a broadly used business practice even if, as a matter of legislative fact, the practice were abused in individual instances only against intrastate operators.[7]

Among the tools at the disposal of Congress in regulating practices which it believes to have a substantial effect upon commerce are judicial remedies conducive to detecting, punishing, and deterring the undesirable tendencies of those practices. Congress might have vested in the Executive branch exclusive power to sue antitrust violators, thereby requiring any single individual aggrieved by misuse of a widely-used practice affecting commerce to enlist government support in prosecuting a lawsuit to end the practice entirely or to punish and deter its commission in the future. But Congress has explicitly authorized the treble damage action by aggrieved private persons as a supplement to judicial action initiated by the Executive branch. The treble damage action is therefore a constitutional exercise of the commerce power even when a single treble damage plaintiff has no appreciable impact on interstate commerce, because the requisite nexus under the commerce power is that between the practice sought to be regulated and the flow of interstate commerce. The treble damage action is, in effect, a form of Congressional regulation less restrictive than direct government litigation aimed at a business practice as a whole. If the one is constitutional, the other is, too.

To summarize: a treble damage complaint under the Sherman Act must "allege facts from which it can be determined that the conduct charged to be in violation of the antitrust laws was reasonably calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce." Kinnear-Weed Corp. v. Humble Oil & Refining Corp., *supra*, 214 F.2d at 894. When, as in Lehrman's case, a broadly-utilized but facially benign business practice is applied in anticompetitive fashion against a single operator, it matters not that his own trade has only an insubstantial effect on interstate commerce. For the conduct of the defendant injects a broad, coercive threat into the otherwise benign practice and is therefore "reasonably calculated to prejudice the public flow of interstate commerce."

B. As a secondary ground for jurisdiction, we decide that Lehrman's busi-

---

7. See Perez v. United States, 1971, 402 U. S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686. There the Supreme Court upheld Perez's conviction under Title II of the Consumer Credit Protection Act, 18 U.S.C. § 891 et seq. (1964 ed., Supp. V), stating that "*a class of activities* [is] properly regulated by Congress without proof that the particular intrastate activity against which a sanction was laid had an effect on commerce." 402 U.S. at 152, 91 S. Ct. at 1360, 28 L.Ed.2d at 691 (emphasis in original). The Court concluded that Perez, regardless of the intrastate confines of the practice for which he was convicted, was clearly a member of the class which engages in "extortionate credit transactions" and that those transactions were adequately found by Congress to affect interstate commerce. "Where the class of *activities* is regulated and that *class* is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class. Maryland v. Wirtz, 1968, 392 U.S. 183, 193, 88 S.Ct. 2017, 20 L. Ed.2d 1020, 1029." 402 U.S. at 154, 91 S.Ct. at 1361, 28 L.Ed.2d at 692 (emphasis in original).

ness did have an impact on interstate commerce that was not "insignificant or insubstantial." International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20. Lehrman's station sold not just gasoline, but tires, batteries, and accessories as well. When the failure of the gasoline operation forced Lehrman to discontinue his entire business, the "TBA" portion of his business went under along with the rest of the operation. There was uncontradicted testimony from Gulf's operations manager that many of the TBA items in Lehrman's stock were products which had moved in interstate commerce, and which did not, as Lehrman's gasoline evidently did, originate in Texas:

Q. Now, also, Gulf sponsors certain tires, batteries and accessories that they like for their dealers to sell: isn't that true?

A. That's true.

Q. And the biggest part of these are manufactured outside the State of Texas and shipped into the State of Texas; now, isn't that true, sir?

A. That's right.

Q. And you would expect to find stations like Mr. Lehrman's or any other station up there in Dawson, Groesbeck, Lufkin, Port Arthur, all up and down that Mesquite Pipe Line, to be selling TBA items, wouldn't you?

A. Yes, sir.

Q. Gulf-sponsored TBA items?

A. I would suppose.

Q. And these items are items that are manufactured in other States and shipped in here to be sold through these stations?

A. That's right.

We conclude that the demise of Lehrman's business had an appreciable impact upon the flow of TBA goods from states where such goods are manufactured into Texas. The effect was appreciable because, while small relative to total Gulf TBA sales, the gross amount of such sales would be significant over the extended period of time Lehrman might have been able to continue in business.

Gulf's only quarrel with this secondary jurisdictional rationale is that "almost without exception, all Gulf TBA items sold in Texas are supplied out of a Gulf mixer-warehouse in the Dallas-Fort Worth area where they are stored after Gulf purchases them from various suppliers." That Gulf TBA items "come to rest" before distribution to Gulf retailers is irrelevant. The requisite effect on interstate commerce would still result from a reduced or altered flow of goods into the State of Texas from without the state. The Supreme Court's holding in Burke v. Ford, 1967, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554, is precisely in point:

The District Court and the Court of Appeals found that the liquor "came to rest" in the wholesalers' warehouses and that interstate commerce ceased at that point. Hence, they concluded that the wholesalers' division of the Oklahoma market did not take place "in interstate commerce." But whatever the validity of that conclusion, it does not end the matter. For it is well established that an activity which does not itself occur *in* interstate commerce comes within the scope of the Sherman Act if it substantially *affects* interstate commerce.

389 U.S. at 321, 88 S.Ct. at 444, 19 L.Ed. 2d at 555.

We are also not persuaded to alter our conclusion that the jury might have premised its jurisdictional finding on TBA sales by the holding of the Ninth Circuit in Page v. Work, 1961, 290 F.2d 323, cert. den. 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76. In that case, the alleged anticompetitive practices of a competitor publication forced the plaintiff newspaper to dissolve and to sell its assets. The assets were purchased by a subsidiary of the defendant and the subsidiary continued publication of the newspaper alleged to have been injured. The Ninth Circuit rejected the contention that a conspiracy to control local legal advertis-

ing substantially affected interstate commerce because of its effect on the interstate newsprint purchases of the plaintiff newspaper. But *Page* does not reject the *principle* of harm to the interstate market in newsprint as a jurisdictional handle over a conspiracy directed to another, local product. Rather, Page simply says that "the argument that the newsprint market suffered because [plaintiff] ceased buying newsprint when it went out of business is not convincing. There is no indication that [defendant who took over plaintiff's operation] purchased any less newsprint from out of state." 290 F.2d at 332.

The rationale is inapplicable to Lehrman. Gulf's actions killed off Lehrman's business permanently. There has been a reduction in Gulf's interstate purchase of tires, batteries, and accessories because, even if the absolute level of such purchases remained constant after Lehrman went out of business, interstate TBA purchases would have reached above that constant had Lehrman continued in operation. There is no indication that Gulf's interstate purchases of TBA items are oblivious to fluctuations in the number of its operating retailers in these times of sophisticated, data-sensitive corporate management.

We do not accept the suggestion that Page v. Work holds, as a matter of law, that a conspiracy to restrain trade in an intrastate product cannot, as a matter of law, affect trade in another, interstate product sufficiently to trigger Sherman Act jurisdiction. The focus of the act is to protect interstate trade from interferences of all degrees of subtlety. The concept of interstate commerce is a practical one. The interstate nerves of a local business can be deadened swiftly by a conspiracy the object of which happens to be the intrastate aspect of a plaintiff's business. We see no reason why the federal courts

should confine themselves to protecting against interferences with interstate commerce which, quite fortuitously, turn out to have motivated the actions of a defendant. It is the effect on commerce that determines federal jurisdiction under the Sherman Act and not any notion of the "interstate culpability" of those who engage in anticompetitive practices. No matter how intrastate the objects of anticompetitive conspirators, they must take their victims' involvement in interstate commerce as they find them.

C. A salient feature of the jurisdictional question in this case is that we are concerned with the Sherman Act and not the Robinson-Patman Act. Gulf has ignored this distinction. Thus, on page one of its petition for rehearing, Gulf says we have "overruled at least three long established, well recognized and often cited Fifth Circuit cases."[8] Gulf also tries to connect the present case with the dissenting opinion of Judge Coleman in Littlejohn v. Shell Oil Company, 5 Cir. 1972, 456 F.2d 225. Yet each of the cases cited by Gulf arose under the Robinson-Patman Act, including *Littlejohn*.

We have attempted to make it clear that jurisdiction under the Robinson-Patman Act is very different from jurisdiction under the Sherman Act.

To maintain an action under Section 13(a) the plaintiff must allege and prove, inter alia: (1) that the defendant is engaged in commerce; (2) that, in the course of such commerce, the defendant has discriminated in price between different purchasers of commodities of like grade and quality; (3) that *"either or any of the purchases involved in such discrimination are in commerce"*; and (4) that there is likely to be a severe, adverse effect on competition. (Emphasis added.) 15 U.S.C. § 13(a). The language of

8. Walker Oil v. Hudson Oil, 5 Cir. 1969, 414 F.2d 588; Abramson v. Colonial Oil Co., 5 Cir. 1968, 390 F.2d 873; Borden Co. v. FTC, 1964, 339 F.2d 953.

The *Borden* case was decided by the United States Court of Appeals for the Seventh Circuit.

the Act—requiring discriminatory sales to be "in commerce"—is far narrower in scope than the "effect on commerce" test applicable under the Sherman Antitrust Act. *See*, e. g., Foremost Dairies, Inc. v. FTC, 5th Cir. 1965, 348 F.2d 674; Jones v. Metzger Dairies, Inc., 5th Cir. 1964, 334 F.2d 919. In appropriate cases, the Sherman Act may be applied to intrastate activities, including retail sales, if they *affect* interstate commerce. *See, e. g.*, United States v. Greater Kansas City Retail Coal Merchants' Ass'n, W.D.Mo.1949, 85 F.Supp. 503. Under the terms of section 13(a), however, at least one of the sales alleged to be discriminatory must actually be *in* interstate commerce. Walker Oil Co. v. Hudson Oil Co., 5th Cir. 1969, 414 F.2d 588 [Dated July 8, 1969]. In Hiram Walker, Inc. v. A & S Tropical, Inc., 5th Cir. 1969, 407 F.2d 4 [Dated January 31, 1969], this Court stated:

> [I]n order to come within the provisions of the Robinson-Patman Act, the [plaintiff] must demonstrate that the discriminatory sales were "in commerce." * * * Thus, the Robinson-Patman Act is applicable only where the allegedly discriminatory transactions took place in interstate commerce. That is, " * * * at least one of the two transactions which, when compared, generate a discrimination must cross a state line."

*See also* Borden Company v. FTC, 7th Cir. 1964, 339 F.2d 953; Willard Dairy Corp. v. National Dairy Products Corp., 6th Cir. 1962, 309 F.2d 943.

Cliff Food Stores, Inc. v. Kroger, Inc., 5 Cir. 1969, 417 F.2d 203, 208–209.

With our discussion in *Cliff Food Stores*, it is instructive to compare the language of the Supreme Court discussing jurisdiction under the Sherman Act, in Mandeville Island Farms, Inc. v. American Crystal Sugar Co., (1948) 334 U.S. 219, 234, 68 S.Ct. 996, 1005, 92 L.Ed. 1328:

[T]he inquiry whether the restraint occurs in one phase or another, interstate or intrastate, of the total economic process is now merely a preliminary step, except for those situations in which no aspect of or substantial effect upon interstate commerce can be found in the sum of the facts presented. For, given a restraint of the type forbidden by the Act, though arising in the course of intrastate or local activities, and a showing of actual or threatened effect upon interstate commerce, the vital question becomes whether the effect is sufficiently substantial and adverse to Congress' paramount policy declared in the Act's terms to constitute a forbidden consequence.

For the reasons stated, we conclude that it was open to the jury to respond to that "vital question" in the affirmative.

## III.

### LIABILITY

We turn now to the question whether Gulf's actions constituted a "contract, combination . . ., or conspiracy, in restraint of trade." The applicable legal framework is well defined.

Any vertical agreement, express or implied, having the effect of pegging or stabilizing prices in the retail market is a substantial threat to the policies of free competition which inspired the Sherman Act. An illegal combination to fix prices results whenever a seller suggests retail prices and secures compliance by means in addition to the "mere announcement of his policy and the simple refusal to deal" if the policy is not complied with. United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 44, 80 S.Ct. 503, 512, 4 L.Ed.2d 505, 515. The federal courts have not hesitated to pierce the subtleties and complexities of resale price maintenance schemes; "a supplier may not use coercion on its retail outlets to achieve resale price maintenance . . . [and] it matters not what the coercive device is." Simpson v. Union Oil Co. of California, *supra*, 377

U.S. at 17, 84 S.Ct. at 1054, 12 L.Ed. 2d 98.

Lehrman's complaint alleged that he was denied price support—punished— when he refused to follow Gulf's suggested retail minimum prices on gasoline. On either of two theories, Lehrman's complaint provided the jury with a basis for finding that Gulf's conduct towards Lehrman constituted an unlawfully coercive effort to secure compliance with Gulf's "suggested" retail prices. One theory is that Gulf conspired with Lehrman's competitor Durst and with Cape Oil Company generally to deny Lehrman further price support in an effort to force Lehrman to adhere to its suggested prices in the course of his future operations, should price support ever be resumed in his favor, or even if it should not. This theory would characterize the withdrawal of price support as designed to teach Lehrman a lesson and to bring him back into line.

Alternatively, Gulf's withdrawal of price support for Lehrman may have been designed to convey a message to Gulf's other retail dealers or to Gulf's competitor Cape Oil Company or to both. If this theory formed the basis of Lehrman's complaint, the allegation would be that Gulf conspired with Cape Oil and with other Gulf retailers to deny Lehrman price support, with no intention of ever again helping to restore Lehrman to a competitive position in his market by use of the TCA system. According to this theory, Gulf was indifferent to Lehrman's own plight and denied price support to him for the purpose of demonstrating to other Gulf dealers the ramifications of any refusal to adhere to Gulf's prices, and for the purpose of reassuring Cape Oil of its resolve to stabilize the prices charged by Gulf dealers relative to those charged by Cape's self-serve stations. Either legal explanation for Gulf's behavior would support a jury verdict in Lehrman's favor.[9]

Gulf's apparent position in defense of its behavior is that a supplier, in a competitive economy, must be free to set those wholesale prices for his product which the market dictates. A supplier must be free to set competitively determined wholesale prices even though those prices necessarily have a strong effect upon the price which retailers may set for their own sales of the product. To choose an obvious example: it is undeniable that the wholesale price, set by the supplier, establishes a floor beneath which the retailer's price cannot fall if he is to continue to make a profit. Thus the bare fact of correlation between wholesale and retail price is not necessarily an indication of illegal vertical price restraint.

Similarly, or so Gulf's argument might continue, it is not inimical to competition for a supplier to vary his wholesale prices in a good faith effort to allow his retailers to respond to varying price competition at the retail level. Such variations in wholesale prices may reflect the supplier's knowledge of competitive conditions in the retail market and enable the supplier to evaluate more accurately the demand for his product, in turn, determined to a large degree by

9. We think it appropriate to add a word about the relevance of Gulf's motivation in denying price support to Lehrman. Few business practices are anticompetitive on their face; whether or not such practices square with the antitrust laws often depends on how the practices are used in day-to-day business operations. It is usually difficult for a court or a jury to cut through the rhetoric with which litigated business practices are described, and thereby to arrive at a reliable sense of the everyday significance of the practice in question. The circumstances surrounding the use of a particular business practice give strong clues as to what those who employ the practice hope to accomplish by it, and what those individuals hope to accomplish may shed light on whether the practice does in fact have the hoped-for, but anti-competitive, effect. In short, when a firm displays an anti-competitive animus in the operation of an otherwise ambiguous business practice, what the firm seeks to accomplish provides as sure an indicator of the actual effect of the practice on competition as can be found in the shifting sands of antitrust litigation.

the needs of retailers who function as buyers in the wholesale market. And, of course, if the wholesaler is behaving competitively when he varies his prices with changing retail price conditions, he must insure that his own price concessions are based upon accurate information about price conditions in the retail market. To this end, Gulf's position might conclude, it is appropriate and understandable that a supplier granting price supports concern itself with the price charged by his own retailers and by retailers of competing produces—for there is no more accurate way to define retail price conditions than by the actual marketplace behavior of the retailers themselves. Arguably, then, there is nothing anticompetitive about varying wholesale prices with retail competitive conditions, and there is nothing anticompetitive about retracting a wholesale price concession when investigation reveals that it was based upon misinformation about retail price conditions.

 Whether or not we would choose to accept this characterization of the TCA system as it was applied to Lehrman, our task on this appeal is more confined. The jury agreed with Lehrman that adherence to a suggested price schedule was the *quid pro quo* for Lehrman's receiving Gulf's TCAs. The jury agreed with Lehrman that the effect of the TCA system was to restrict the flexibility of Lehrman's retail prices and not to facilitate flexible responses by Gulf to the volatile retail gasoline market. We must decide whether the evidence was insufficient to support that finding— whether "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374. Viewing the evidence in a light favorable to Lehrman, as we must, we hold that there was ample evidence from which the jury might have inferred that Lehrman's TCAs were conditioned upon his adherence to prices "suggested" by Gulf, and that the TCAs were withdrawn from Lehrman for anticompetitive reasons when he refused to follow Gulf's price list.

The key evidence, of course, was the testimony indicating that Gulf discontinued support for Lehrman's prices when Durst ꞏ complained that Lehrman was charging a penny too little for each gallon of Gulftane. Although some reasonable persons might attribute no punitive motivation to Gulf's decision to withdraw price support from Lehrman after Gulf received Durst's complaint, we cannot say that it would be impossible to conclude otherwise. It was not unreasonable for the jury to find that Gulf insisted on adherence to the company's prices as a means of achieving price stabilization among its outlets and between its outlets and those of the Cape Oil Company in Texas.

A second source of support for the jury's verdict was the evidence that Gulf "suggested" specific retail prices to be applied at each TCA level. A jury might find these suggestions strange for a supplier who was granting a particular amount of price support on the theoretical ground that it already knew what price retail competition would force its dealer to charge. The "suggestions" had strong overtones of redundancy when considered in light of the only tenable justification for the TCA system as a whole. The jury might well have decided that the specificity of the price suggestions, coupled with the economic significance of the TCAs to retailers, were calculated not to facilitate retail pricing decisions but rather to imply that adherence to the "suggested" prices and the granting of price support went hand in hand.

A third basis for the jury verdict emerges from the evidence that Gulf unabashedly fixed Lehrman's prices through a "consignment" agreement until such agreements were held unlawful by the Supreme Court in 1964. In light of the other evidence supporting its verdict, the jury might have been persuaded that Gulf's elaborate TCA system was a subtle means of achieving

what formerly was accomplished through open price-fixing. We do not place great stress on this historical factor, and were there a complete absence of other supportive evidence we might hesitate to uphold the jury's verdict on account of history alone. But as a part of the total picture which the jury considered, Gulf's past practices were relevant to the issue whether Gulf price supports were a vertical price fixing scheme in disguise.

At the trial, Gulf introduced no evidence to prove that Durst's complaint to Stokes was causally unrelated to Gulf's decision to cut off Lehrman's price support. Instead, the only justification for the cut off which emerges from the record is that proffered by Stokes himself: he refused to grant Lehrman further price support after Durst complained because Lehrman's low prices proved that Gulf's price support money was being wasted.[10] Whatever the merits of this justification for Gulf's behavior, it was open to the jury to reject it. The jury did reject it. Nevertheless, we feel that it is appropriate to explain why we do not believe that Stokes's explanation for cutting off Lehrman's price support upon Durst's complaint will withstand analysis.

■ We accept *arguendo* the assumption underlying Stokes's testimony; that generally the TCA system was designed to enable Gulf to respond through its wholesale prices to competitive conditions in the retail market. But only a very limited form of retail price policing promotes competition even if we agree that the wholesaler is entitled to some assurance that his price concessions are really needed by the retailer. The supplier has a legitimate interest in satisfying himself that: a) retailers of competing brands are charging no *more* than the price which they have been represented as charging; and b) retailers of the supplier's own product are charging no *more* than the price they have represented as being competitively necessary and as requiring wholesale price support.

The supplier must ascertain the prices charged by competing retailers to insure that his dealer's view of the prevailing price competition is accurate. He must ascertain the price actually charged by his own retailer after support is granted to insure that the dealer is not pocketing the price support instead of passing it on to consumers through lower retail prices which presumably would mean more effective retail price competition and increased demand reflected at the wholesale level.

Yet, despite Gulf's protestations to the contrary, there is no comparable justification for conditioning wholesale price support upon adherence to a schedule of *minimum* retail prices. When a dealer sets his retail prices at a given level, that level is a reliable indicator that market pressure dictates the price. Retail prices lower than those expected by a wholesaler when he grants wholesale price support reflect either the retailer's willingness to maintain a reduced gross margin of profit in hopes of higher sales volume, or the insufficiency of a particular level of wholesale price support. They do not reflect, as Gulf maintains, the excessiveness of the price support, for the wholesaler has no more right to dictate to the retailer an appropriate margin of profit on retail sales than to set his retail prices outright. If anything, when Gulf discovered Lehrman setting retail prices below its expectations for a particular amount of price support, Gulf would have investigated to see whether Lehrman needed additional price support, were Gulf truly concerned with keeping Lehrman competitive.

■ There is one additional sense in which Gulf's price support to Lehrman might be characterized superficially as "excessive". This is on the ground that Lehrman was selling Gulf gasoline for less than Gulf expected him to sell it when Gulf granted the wholesale price support. Arguably, price support for Lehrman was excessive because it enabled him to plunge both himself and

10. See note 3, *supra*.

his self-service competitor into a price war—a price war which foreseeably would result in Gulf's having to make unprofitable, below-cost sales to Lehrman if it wished to keep Lehrman alive. Although this explanation for Gulf's behavior probably cuts close to the heart of the matter, it would not—even were we freed from the jury's verdict to decide this case ourselves—save Gulf from the dictates of the Sherman Act's per se prohibition of resale price maintenance. The argument amounts to a confession that Gulf has an interest in conditioning price support upon resale price maintenance because free competition among retailers might generate further dealer pressure on existing wholesale prices. We cannot accept this argument. Resale price maintenance schemes are "unlawful under [§ 1 of the] Sherman Act without any necessity for inquiry in each particular case as to their business or economic justification, their impact in the marketplace or their reasonableness . . ." United States v. Sealy, Inc., 1967, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238.

█ A supplier need not grant any wholesale price support to its retailers, whether it calls that price support a "temporary competitive allowance" or attaches some other label to the concession. But if the supplier does grant price support, and if price support is as crucial to the retailer's success as it is to a gasoline retailer's, the supplier cannot withdraw or substantially reduce price support simply because a retailer chooses to reduce his gross margin of profit and sell the product at retail for less than the supplier suggested, expected, or desired.

## IV.

## THE ADMISSION OF EVIDENCE

█ In addition to questioning the sufficiency of the evidence to support the jury's verdict, Gulf contends that the admission of certain evidence not directly related to Lehrman's own business dealings with Gulf undermined the integrity of the jury's verdict and requires us to remand for a new trial. First, Gulf assigns as error testimony admitted over its objection concerning the prices charged for gasoline in Waco. Gulf complains of the testimony regarding prices in Waco because it says Lehrman stipulated that his competitors "were the service stations located in Mart, Texas, and the three service stations located in Harrison's Switch (Hallsburg, Texas." [11] Both at trial and in this Court Gulf has urged that this stipulation be read as one which stated that the relevant market in which Lehrman competed was limited to the Mart area. But counsel for Lehrman deny, both here and at trial, that the ambiguous words of the stipulation conceded that Lehrman competed *exclusively* with the Mart and Harrison Switch stations.[12] We agree. In overruling Gulf's

11. The full text of stipulation number 19 is as follows:

19. Plaintiff's competitors were the service stations located in Mart, Texas, and the three service stations at Harrison's Switch (Hallsburg), Texas, which were located 8–9 miles from Mart, Texas.

12. The colloquy is reported as follows in the official transcript:

Q Mr. Lehrman, were there Gulf Stations in Waco that were selling at a price below which you were selling during the period that you operated the station in Mart?

MR. ERWIN: Your Honor, we object to that. That goes directly to the question of whether or not there is price discrimination, and that has nothing to do with this case. It is completely irrelevant to the issues here.

MR. PRICE: It has to do with the price-fixing structure.

MR. ERWIN: It doesn't have anything to do with the price that we sell to Mr. Lehrman, if they are not in competition with each other, and there is no allegation of price discrimination, and so it is completely irrelevant and immaterial.

MR. PRICE: Your Honor, of course, we contend that they are in direct competition, and I think the evidence proves it. I don't think there will be any to disprove it.

MR. EDWARDS: Besides that, Your Honor, we have a stipulation with re-

objection, the district judge implicitly accepted Lehrman's interpretation of the stipulation, or at least refused to hold Lehrman to the stipulation that he was not in competition with some Waco stations. Despite the ambiguous stipulation, then, it was not error to admit testimony concerning prices in Waco. Lehrman introduced testimony, never controverted, that many of Lehrman's customers worked in Waco and bought gasoline there, and were therefore in a position to be diverted away from Lehrman by lower prices in Waco. After this testimony established that Lehrman and the Waco stations were in direct competition, evidence of price discrepancies between Mart and Waco was properly admitted to demonstrate the impact of Gulf's pricing policies on Lehrman's ability to carry on his business.

 Gulf also complains of the admission of the testimony of Duane McDonald and G. B. McDonald, both of whom testified as to their experiences as Gulf dealers in the Dallas-Fort Worth corridor. This testimony, says Gulf, was irrelevant; what took place in the Dallas-Fort Worth area had no bearing upon Gulf's dealings with Lehrman in Mart, since "price fixing or coercion if proved by one dealer at the end of Main Street does not prove that price fixing was practiced at the other end of Main Street, much less in two stations located hundreds of miles apart." But Gulf confuses the relevance of a piece of evidence with its sufficiency to prove a contested

proposition of fact. The McDonalds' testimony was relevant, although perhaps not sufficient had it stood alone. It was relevant because it showed that Gulf had previously indicated by its behavior a concern with stabilization of its retailers' prices in the Texas market, and evidence is relevant if it has "any tendency to make the existence of [a controverted proposition] more probable . . . than it would be without the evidence." Rule 401, Proposed Rules of Evidence for the United States Courts (Rev.Draft, March 1971). We repeat: the testimony was relevant because it made the proposition sought to be demonstrated more likely of belief than it would have been in the absence of the testimony, *even though* the McDonald's testimony alone would not necessarily make the proposition more likely to be true than untrue.

Gulf also ignores the predicate which Lehrman established for the testimony of the McDonalds. At the time of trial, Stokes was a sales director for Gulf, with responsibility for eight districts in the Southwest, covering three states. He had been district manager of the Tyler District (which included Mart and Waco) from 1960 to 1967. Stokes testified that Gulf's TCA pricing system was employed throughout the districts of the three states over which he had jurisdiction. He responded affirmatively a second time when asked if Gulf's pricing system was the same throughout all the areas of which he had knowledge.[13] Stokes' tes-

gard to the market area being confined solely to Mart, and that is in the pretrial order, also . . . .

THE COURT: Is there a stipulation that the market is limited to the Mart area?

MR. PRICE: I have made no such stipulation, Your Honor.

THE COURT: The objection is overruled.

13. Q. Well, now, we started on the explanation of the pricing system but, first, let me ask you, has it been the same basically down in the Beaumont area when you worked there?

A. Now, what are you asking was the same?

Q. Whether the pricing system was basically the same, what you started to explain about support and assistance and so forth, has the basic system been the same during all of these years you have worked for Gulf in these different areas?

A. When I was in Beaumont I didn't know what the pricing system, as you call it, is, and I never had anything to do with pricing.

Q. Well, when you moved to Fort Worth in the 'fifties, since that time has it been basically the same?

timony, then, established rough uniformity between the business practices of Gulf in Mart and those testified to for the Fort Worth-Dallas area by the McDonalds. This uniformity, though of course there are significant differences in the two areas, was enough to make the McDonalds' testimony at least relevant within the very broad confines of the definition mentioned above.

Perhaps, then, Gulf's real quarrel with the admission of the McDonalds' testimony is not with its relevance, but rather with its tendency to prejudice the jury against Gulf. But we cannot say the lower court erred in its balancing of the probative need for and value of the McDonald testimony against the possible prejudice to Gulf resulting from its admission. Weighing these values is a delicate task which the trial judge, in his intimate familiarity with the proceedings, is better suited than we to accomplish. The trial judge might well have thought it crucial to the jury's understanding of the case that evidence be heard from other retailers who had dealt with Gulf; in the absence of such testimony, the jury might easily have concluded that Lehrman was an eccentric who was one in a million Gulf station owners to complain of Gulf's pricing practices. It would no doubt be difficult to produce a qualified witness from the Mart-Waco area, since Gulf dealers still in business would be understandably reluctant to testify against Gulf; indeed, other dealers might well have been content with the price stabilization facilitated by the TCA system. Moreover, upon Gulf's objection, the trial court excluded testimony of the McDonalds that might be considered inflammatory. In the circumstances, we see no reversible error affecting the substantial rights of the parties in admitting the McDonalds' testimony. Because we also believe there was no error in admitting testimony concerning the price of gasoline in Waco, we hold that the lower court's judgment on liability was supported by sufficient evidence and that it must stand.

## V.

### DAMAGES

Also at issue on this appeal is the method used by the trial court in calculating the damages to be awarded Lehrman. The jury was asked to determine, from a general instruction,[14] the quan-

---

A. To my knowledge, the tank wagon prices have remained relatively level, and we grant support in the same manner we have been doing for several years.

Q. And as far as you know all of the areas in which you have had any personal knowledge or contact, it is basically the same, and still is today?

A. Now, what are you referring to now?

Q. This basic pricing system.

A. I don't know what you mean by the pricing system. You keep getting to this, but I am with you in saying I haven't seen any changes, but I still don't know what you mean—

Q. By pricing system?

A. —by "system."

Q. Well, whatever the system is, and I am going to get into that in a little bit, in just a minute, Mr. Stokes, but it has remained basically the same, and it is basically the same throughout all areas that you have knowledge of?

A. Yes.

14. "In determining the damages, if any, that the Plaintiff sustained as a result of a violation, if any, of the Antitrust Law, you are to be governed by the following instructions:

The terms "business" and "property," as used in the Antitrust Laws, signifies that which habitually busies or engages time, attention or labor as a principal serious concern or interest. Our law permits the jury to take into account both any damages which may have been inflicted on existing property and the damages which may have been sustained as a result of being unable to make profit which reasonably could have been anticipated and would have been realized if it were not for the violation of the Antitrust Laws, if any such violation occurred. But you are instructed that it must first be determined that any conspiracy which may or may not have existed was a substantial, identifiable cause of the damage, if any, to the Plaintiff.

tum of damage sustained by Lehrman as a result of the anticompetitive practices of Gulf. The jury was authorized to find that Lehrman was damaged by the amount of any future net profits which did not accrue to him but which would have accrued to him in reasonable probability but for the conspiracy of which Lehrman complained. The trial court cautioned the jury not to base any calculation of future profits upon speculation or "sheer guesswork", but only upon "a just and reasonable estimate of damage based on the relevant evidence." The relevant evidence, according to the trial judge's charge, included "the past history and net profits of the business, the experience and competence of the plaintiff in the filling station business, the competition which the plaintiff would have had

in and around Mart, Texas, and the general market conditions in that area." The jury returned a verdict of $60,000 in Lehrman's favor, and when asked, the foreman explained that the $60,000 sum was intended to cover a ten-year period. The district court set aside this verdict and entered judgment for Lehrman in the amount of $21,000 trebled ($63,000) plus costs and interest. In so doing, the court explained that it was reducing Lehrman's damages from a period of ten years' duration to one of only three and a half years—the period from 1964 to 1967 during which Lehrman operated his Gulf station as a lessee.[15]

Gulf raises several objections to the damage calculation. First, it objects to the use of future profits as a measure of Lehrman's damages because, it contends

In a suit alleging a violation of the Antitrust Laws, in order for the Plaintiff to recover, he must prove that the violation was an identifiable, direct and substantial cause of the damage which he sustained. The Plaintiff then must satisfy you that the damage, if any, which he suffered, was as a fact attributable to the conspiracy, if any there existed. But while the Plaintiff has the burden of showing that any damage which he may have sustained was the result of the violation, he would not have to prove with exact mechanical accuracy the extent of the damages; however, the damages alleged must be established by a preponderance of the evidence as a direct and identifiable result of a violation of the Antitrust Laws. In other words, the Plaintiff must satisfy you that the damages, if any, would not have occurred but for the violation, if any.

In this case you are instructed that you cannot award any damages, if any, that may have occurred prior to March 1, 1964.

In considering the element of future profits in determining what damages, if any, were sustained by Plaintiff, you are instructed that if because of a conspiracy the Plaintiff was unable to earn net profits which would in reasonable probability have accrued to him but for the conspiracy, then, Plaintiff was in fact damaged. Future profits mean net profits, and are determined by subtracting the cost and expense of a business from its gross revenue.

You are instructed that you may consider in determining whether or not any part of Plaintiff's damages constitute future net profits the past history and net profits of the business, the experience and competence of the Plaintiff in the filling station business, the competition which the Plaintiff would have had in and around Mart, Texas, and the general market conditions in that area. You may not base any findings of damages on sheer guesswork, but must make a just and reasonable estimate of damage based on the relevant evidence."

15. THE COURT: The Judgment is ordered in the amount of—ordered for the Plaintiff in the amount of $21,000.00. The jury, you will recall, stated in their findings that they based the computation of the damages under the charge at a rate of $6,000.00 per year. The evidence showed that the actual tenure—and if I am wrong about this, you gentlemen correct me—the actual time that the Defendant—that the Plaintiff spent in the station as lessee-dealer, or whatever he is, was three and a-half years; is that correct, three and a half years?

MR. PRICE: That is as I recall it, Your Honor.

THE COURT: All right. That is why the judgment is entered in the amount of $21,000.00. Motion for modification or for judgment n. o. v., that is not a correct motion, either, that is, in response to the motion n. o. v., but the damages are modified to that extent, $21,000.00.

that allowing Lehrman to recover for future profits would enable a proprietor who has been the victim of a single anti-competitive practice to walk away from his business and collect damages for future profits despite the possibility that the business might still be operated successfully. Gulf stresses that the cases which have allowed future profits as a measure of antitrust damages have been cases involving refusals to deal, or cancellation of leases, both of which practices rendered it impossible for the proprietor who had been damaged to continue in business.[16]

We do not accept Gulf's restrictive application of the principle of future profits as antitrust damages. When a practice condemned by the Sherman Act puts a small operator out of business, we do not think it matters whether the antitrust violator directly closes down the small proprietor or whether he takes anticompetitive steps which foreseeably will result in the proprietor's demise if carried on for a sufficient amount of time. Nor are we persuaded by Gulf's prediction that the awarding of future profits in this context licenses the victims of single antitrust violations to abandon their still-thriving businesses in order to cash in on the bonanza of a future profits judgment. The facts of the present case give no hint that Lehrman abandoned a successful gas station in the hopes of securing a large judgment in his favor. After 1965, Lehrman struggled along until finally it was clear that the station was not worth his while.[17]

Gulf also protests the "speculative" testimony of Ernest Brown and urges us to hold this testimony an inadequate basis for assessing Lehrman's damages. But Gulf merely protests application of the familiar rule that a wrongdoer is responsible for uncertainty in calculating the damages proximately caused by his own wrongdoing. On the facts of the present case, there was evidence from which a jury might conclude that Gulf's decision to punish Lehrman by means of its TCA system for his failure to abide by Gulf's system of "suggested" prices caused the demise of Lehrman's station. Once it is apparent that damages must be assessed so as to approximate the future profits of a business, a court and jury necessarily enter into the realm of the imprecise and the uncertain. Particularly is the calculation of damages difficult when the future profits of an enterprise as young as Lehrman's must be determined, since there is no reliable track record to look back on. But uncertainty cannot end the efforts of the federal courts to redress the harm caused proprietors by violations of the freedom of the marketplace. The wrongdoer must bear the risk of the uncertainty in measuring the harm he causes. Bigelow v. RKO Radio Pictures, Inc., 1946, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652; Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 566, 51 S.Ct. 248, 75 L.Ed. 544. The Supreme Court has recently reminded us that "[t]rial and appellate courts alike must also observe the practical lim-

---

16. E. g., Lessig v. Tidewater Oil Co., 9 Cir. 1964, 327 F.2d 459, 465; Osborn v. Sinclair Refining Co., 4 Cir. 1963, 324 F.2d 566.

17. The record reveals the following key statistics for Lehrman's business.

| GASOLINE | GALLONAGE |
|---|---|
| 1960 | 102,219 |
| 1961 | 100,524 |
| 1962 | 106,444 |
| 1963 | 107,404 |
| 1964 | 128,750 |
| 1965 | 103,107 |
| 1966 | 81,417 |
| 1967 * | 62,727 * (nine and one-half months) |

TOTAL SALES (rounded to next dollar)

| | |
|---|---|
| 1960 | $41,344 |
| 1961 | 39,103 |
| 1962 | 39,345 |
| 1963 | 43,831 |
| 1964 | 48,985 |
| 1965 | 46,338 |
| 1966 | 38,301 |
| 1967 * | 28,480 *(nine and one-half months) |

NET PROFIT [or (LOSS)]

| | |
|---|---|
| 1960 | ($1015) |
| 1961 | 690 |
| 1962 | ( 2971) |
| 1963 | ( 78) |
| 1964 | 1376 |
| 1965 | 1105 |
| 1966 | 1295 |
| 1967 * | ( 2322) *(nine and one-half months) |

its of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible for the kind of concrete, detailed proof of injury which is available in other contexts." Zenith Radio Corp. v. Hazeltine Research, Inc., 1969, 395 U. S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed. 2d 129, 148.

In characteristically forthright language, Mr. Justice Black addressed himself to the very problem before us when the *Simpson* case found its way back to the Supreme Court, after remand, on the issue of damages. We quote Mr. Justice Black's explication of the *Bigelow* rule:

> Antitrust damages such as those involved here are bound to be "speculative" and "conjectural" to some extent. When a person wrongfully takes government bonds worth $10,000 on the market, the damages can be precisely measured. But when as here a young man's business is wiped out root and branch by a wrongdoer, the measurement of the victim's damages is not so simple a matter. This is true because no one can infallibly predict how long that business would have continued to grow and flourish or precisely how much the business would have been worth to him in 25 years. But certainly a fair and just legal system is not required by difficulties of proof to throw up its hands in despair and leave the sufferer's damage to be borne by him while the person who did the wrong goes scot free. This Court has refused under such circumstances to hold that our system of justice is so helpless to do justice. In this very antitrust field our Court has specifically and pointedly refused to permit antitrust violators to escape liability for their wrongs on the argument that damages must not be awarded because they are uncertain and speculative.

Simpson v. Union Oil Co., 1969, 396 U. S. 13, 16, 90 S.Ct. 30, 32, 24 L.Ed.2d 13, 16 (Black, J., concurring and dissenting).

In short, the law is clear: the courts are to take a charitable view of the difficulties of proving damages in a case when a treble-damage plaintiff must try to prove what would have accrued to him in the absence of the defendant's anticompetitive practice. Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc., 5 Cir. 1967, 383 F.2d 97, 106. But this tolerant view is limited by our responsibility not to allow damages to be determined by "guesswork" or "speculation"; we must at least insist upon "a just and reasonable estimate of the damage based on relevant data." *Bigelow, supra,* at 327 U.S. 264, 66 S.Ct. at 580, 90 L.Ed. 652; Poster Exchange, Inc. v. National Screen Service Corp., 5 Cir. 1970, 431 F.2d 334, 338. We must continue to be sure that damage awards of the kind involved in the present case meet the basic requirements of coherency and consistency which any lawyer expects of an ordinary recovery on, say, contractual expectations, perhaps the most analogous problem of damage calculation to the one before us today. We are unable to find the requisite degree of coherence in the damage award before us, and we remand the cause for further proceedings restricted to the question of the proper measure of Lehrman's damages.

To begin with, so far as we have been able to discern from the record, there was no allowance in the original jury verdict for mitigation of Lehrman's damages by the amount of his earnings in his current line of work. The income tax returns in the record indicate that Lehrman's salary expenses of running his gas station were not incurred as salary payments to himself; consequently, there seems to be no possibility that Lehrman's earnings above the net profits of the station (in the form of a salary paid to him by the station) might have been properly included in the measure of his damages. Rather, it appears that when Lehrman's gas business folded, he was freed for other paying forms of work, and that Lehrman could be damaged only by the excess of any lost future net prof-

its over his actual earnings in alternative employment. Thus, from the outset, the $60,000 for ten years, or $6000 per year, figure which underlay the jury verdict was based upon too broad a conception of the damages caused Lehrman by Gulf's punitive withdrawal of TCAs.

Failure to instruct the jury to deduct a reasonable amount attributable to Lehrman's earnings after leaving the gas station business was the only defect in the lower court's charge to the jury. In light of this error in the underlying damage calculation of $6000 per year, the appropriateness of the district court's "remittitur" is not strictly at stake on this appeal. But we have several difficulties with the court's remittitur, and think it best to elaborate those difficulties at this point rather than to await the possibility of further confusion, error, and delay.

■ It is not clear whether the trial court's decision to enter judgment for Lehrman in the amended amount of $6,-000 times three and a-half years, in lieu of the jury determination of $6000 times ten years, (both sums trebled), constituted a determination of law or a determination of fact. If the district court meant to hold that the duration of the plaintiff's harm was, as a matter of fact, only three and a-half years, it was improper for the court to allow the jury to make a factual determination of ten years and then to overrule the jury's finding of fact by entering judgment contrary to it. The district court gave the plaintiff no chance to decide whether he wished to remit a portion of his damages or face the possibility of a new trial. Instead, when there was factual uncertainty over the amount and duration of plaintiff's harm, the court simply took a different view from the jury's and entered judgment accordingly. In so doing, if that is what the court was doing, the trial court violated the command of the Seventh Amendment, which prohibits re-examination of the facts found by a jury. Prochot v. Drew, 7 Cir. 1960, 283 F.2d 904, 905; see 6A Moore's Federal Practice #59.05 [3] n. 36.

■ On the other hand, if the district court's "remittitur" was truly intended as a ruling that, as a matter of law, damages incurred by reason of an unlawful conspiracy to fix resale prices must be limited to the actual years of business operation, that proposition of law cannot stand. In cases involving refusal to deal, it is clear that damages cannot be limited to losses sustained before the plaintiff is unlawfully cut off from his supplier. E.g., Osborn v. Sinclair Refining Co., 4 Cir. 1963, 324 F.2d 566. Whether a man's business is intentionally and immediately snuffed out, as by a refusal to deal, or whether it is slowly but surely forced under by anticompetitive wholesale pricing, the proper standard of measuring damages when a business is forced under by anti-competitive activity is the same: what financial advantage would the plaintiff have gained but for the actions of the defendant? The duration of the period during which the plaintiff might be expected to profit will vary from case to case; it is susceptible of no precise formulation, and must be left to the processes of the jury informed by the presentation of conflicting evidence. Of course, the court might properly instruct the jury that it may consider as one factor in its deliberations the length of time which the plaintiff had been in business as of the time of the defendant's anticompetitive actions; but the youth of a business, like the precise manner of its doing-in, will never alone be enough to justify severe restrictions upon the duration of damages. The court may condition a new trial on remittitur if it feels strongly that the jury verdict is excessive. But it is arbitrary and improper to limit damages as a matter of law to the precise period of the plaintiff's business operations if the reason for that limitation is either the means used to drive the plaintiff out of business or the relatively short history of his business before its demise.

We remand the cause to the district court for a new trial only on the issue of damages. At the new trial, Lehrman

**48**

may introduce additional evidence to provide the jury with a better "yardstick" to measure Lehrman's losses. There may be additional evidence to clarify the possible length of Lehrman's future tenure in the station and therefore the appropriate duration of future profits. Additional evidence will likely be necessary to provide some measure of the deduction from Lehrman's damages which must be attributed to the present and future earning capacity he now has which he would not have enjoyed had he continued to look chiefly to the station for his income and to devote most of his time to its operation.

The judgment of the district court as to Gulf's liability is affirmed; but that court's judgment as to the amount of the plaintiff's damages is reversed and the cause remanded for further proceedings consistent with this opinion.

McLaughlin, Circuit Judge, dissented in part.