Vernon S. BODDICKER, Richard W. Peay, Hugh L. Thompson and Dwight G. Hudson, Plaintiffs-Appellants,

v.

ARIZONA STATE DENTAL ASSOCIATION, an Arizona Non-Profit Corporation, Central Arizona Dental Society, an Arizona Non-Profit Corporation, American Dental Association, an Illinois Non-Profit Corporation, Defendants-Appellees.

No. 75–1846.

United States Court of Appeals, Ninth Circuit.

Jan. 6, 1977.

As Amended on Denial of Rehearing and Rehearing En Banc March 1, 1977.

Carl W. Divelbiss, Phoenix, Ariz. (argued), Erhard, Cox & Ruebel, Dallas, Tex., Divelbiss & Gage, Phoenix, Ariz., for plaintiffs-appellants.

Peter M. Sfikas (argued), of Peterson, Ross, Rall, Barber & Seidel, Chicago, Ill., David L. White (appeared), of Jennings,

Strouss, & Salmon, Phoenix, Ariz., for defendants-appellees.

Before GOODWIN and SNEED, Circuit Judges, and FITZGERALD,[*] District Judge.

## OPINION

SNEED, Circuit Judge:

This case comes before us as an appeal from a dismissal by the district court of plaintiffs' amended complaint for lack of subject matter jurisdiction under §§ 1 and 2 of the Sherman Act[1] and for failure to state a claim upon which relief could be granted.[2] Plaintiffs, licensed dentists within the State of Arizona, alleged that the American Dental Association (hereinafter referred to as the "ADA"), the Arizona State Dental Association (hereinafter referred to as the "ASDA"), and the Central Arizona Dental Society (hereinafter referred to as the "CADS"), have agreed among themselves to require membership in the ADA as a condition precedent to membership in the ASDA and the CADS, thus creating an anticompetitive tying arrangement by coupling participation in the local organizations' beneficial programs to membership in the ADA. Plaintiffs contend that this practice violates §§ 1 and 2 of the Sherman Act. The case involves two questions: whether plaintiffs' amended complaint adequately alleges a restraint of trade substantially affecting interstate commerce, and whether dentistry as a "learned profession" is exempt from the application of the Sherman Act.[3]

## I. The Facts.

■ For the purposes of a review of a dismissal on the pleadings, we accept as true plaintiffs' material allegations in their first amended complaint. *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948).

Defendants ASDA and CADS are nonprofit corporations organized under the laws of Arizona. Briefly summarized, the identical objectives and purposes of the ASDA and the CADS are to improve public health and the profession of dentistry by encouraging research, disseminating new knowledge in the profession, advancing the standard of dental education, enlightening the public in relation to oral hygiene and advanced dental service, and promoting and maintaining a high order of professional excellence. Membership in the ASDA and the CADS is not a prerequisite to the practice of dentistry in Arizona; plaintiffs, however, derive substantial benefits from such membership including participation in continuing education programs, group insurance, the exchange of information with and the referral of patients by fellow members, and the entry into various specialty organizations of dentistry. Pursuant to the by-laws of the ADA and the ASDA, a dentist may not become or remain a member in good standing in the ASDA or the CADS without also being a member of the ADA. The by-laws of the ADA designate the ASDA as a constituent society; the by-laws of the ASDA designate the CADS as a component society. The ASDA and the CADS remit the dues which they collect on behalf of the ADA to the ADA at its cen-

---

[*] Honorable James M. Fitzgerald, United States District Judge for the District of Alaska, sitting by designation.

[1]. 15 U.S.C. §§ 1, 2 (1970).

[2]. The district court minute entry indicated that: "[T]he antitrust claim should be dismissed because the activities complained of do not

affect interstate commerce and because the procedures involved in joining professional associations do not constitute 'trade or commerce' within the purview of the antitrust laws . . . ."

[3]. Plaintiffs also demand attorney's fees. It is inappropriate at this stage of the proceedings to discuss the propriety of such relief.

tral office in Illinois. Plaintiff Vernon S. Boddicker tendered the annual dues for the ASDA and the CADS, excluding the annual dues for the ADA; the CADS rejected this tender and with the ASDA dropped him from their rolls. Plaintiffs Richard W. Peay and Hugh L. Thompson paid under protest the annual dues of all three organizations in order to retain their status as members in good standing of the ASDA and the CADS.

Defendant ADA is a nonprofit corporation organized under the laws of the State of Illinois. It provides a large range of services for dentists across the nation. A sampling of its nationwide activities is as follows: the publication and dissemination of journals, a newspaper, and newsletters, the conducting of dental aptitude tests, the accreditation of dental programs for hospitals, the providing of insurance programs for its members, and the dispatch of speakers to various states. As a result of its system of designating local organizations as constituent societies, which in turn require membership in it as a condition precedent to constituent society membership, the ADA collected in annual dues for 1972 an amount in excess of $6,000,000.

According to the amended complaint, expulsion from the local societies for failure to pay the ADA's dues will impair the ability of plaintiffs to practice dentistry in that they will be prevented from participating in the programs and activities of the ASDA and the CADS. Moreover, plaintiffs alleged that payment of dues to the ADA for which they receive no benefit is an unreasonable condition to membership in the ASDA and the CADS, and that this financial burden is passed on to the consumer in the form of increased dental costs. They also allege that the practice of dentistry throughout the nation is similarly affected.

II. *Jurisdiction.*

In enacting the Sherman Act, Congress intended that the jurisdictional reach of the Act be coterminous with Congress' constitutional power to regulate commerce. *Mandeville Island Farms, Inc. v. American Crystal Sugar Co., supra; United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); *Rasmussen v. American Dairy Ass'n*, 472 F.2d 517 (9th Cir. 1972), *cert. denied*, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).

This court has traced the history of the coordinated expansion of the Commerce Power and the reach of the Sherman Act many times. We need not retrace it here. The presence of Sherman Act jurisdiction depends on whether it is within the power of Congress to regulate the defendants' conduct of which the plaintiffs complain. The answer is clearly affirmative. Congressional power exists when the conduct exerts a "substantial economic effect" on interstate commerce. *Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *Rasmussen v. American Dairy Ass'n, supra.* Viewed from the jurisdictional standpoint of the Sherman Act, the Supreme Court recently indicated that the critical inquiry is "the adequacy of the nexus between [defendant's] conduct and [the] interstate commerce that is alleged in the complaint." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. at 742, 96 S.Ct. at 1851 n.1. The nexus is unquestionably adequate here. The multistate scope of the ADA's membership, programs, and dues arrangements with local societies demonstrates this. These activities make possible a flow of funds, both from the individual dentists to the ADA and from the ADA to others, that substantially affects interstate commerce.[4] Moreover, the exclusion of the plaintiffs from the ASDA and the

---

4. In addition, plaintiffs contend that expulsion from the local societies will diminish their practice and professional reputation. A less vigorous dental practice necessarily includes the use of fewer supplies, less equipment, etc. Although the amount of interstate commerce affected by the deterioration of three dentists' practices may seem insubstantial, like effects on the practices of similarly situated dentists across the nation probably will result in the altered flow of dental supplies in interstate commerce. *See Doctors, Inc. v. Blue Cross of Greater Philadelphia*, 490 F.2d 48 (3rd Cir. 1973).

CADS pursuant to the dues arrangement can be considered "an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states."[5] In any event, at this stage of the proceedings, we cannot say that the challenged practices are more tenuous and remote from interstate commerce than were the practices of lawyers successfully challenged under the Sherman Act in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 781–85, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

■ Therefore, we hold that the allegations contained within the first amended complaint set forth practices not beyond the reach of the Sherman Act.

### III. *The Learned Profession Exemption.*

To dispose of the second question which this case presents, *viz.* whether dentistry is exempt from the Sherman Act as a "learned profession," we must consider primarily two recent Supreme Court decisions.

The first is *Goldfarb v. Virginia State Bar, supra,* in which the Court renounced an unlimited exemption from the Sherman Act for "learned professions." It stated:

> The nature of an occupation, standing alone, does not provide sanctuary from the Sherman Act . . . . Congress intended to strike as broadly as it could in § 1 of the Sherman Act, and to read into it so wide an exemption as that urged upon us would be at odds with that purpose. 421 U.S. at 787, 95 S.Ct. at 2013.

In addition, it held that attorneys engaged in "commerce" when, under the circumstances of the case, they examined land titles in exchange for money and that the conduct of the Fairfax County Bar and the Virginia State Bar in publishing and enforcing minimum fee schedules amounted to price fixing in violation of section 1 of the Sherman Act.

The Court, however, did not hold that professions and their practices should be analyzed for Sherman Act purposes precisely as are ordinary commercial enterprises. This is made clear by the opinion's footnote 17 which reads as follows:

> The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today. 421 U.S. at 787–88 n.17, 95 S.Ct. at 2013.

This footnote, however, offers little guidance with respect to the manner in which a particular practice of a profession should be approached to determine its compatibility

---

**5.** *United States v. Frankfort Distilleries, Inc.,* 324 U.S. 293, 297, 65 S.Ct. 661, 89 L.Ed. 951 (1945), *quoted in Goldfarb v. Virginia State Bar,* 421 U.S. 773, 784, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Plaintiffs argue that the success of defendants' agreement is dependent upon the ability of defendant ADA to impose similar agreements on all local and state societies. Thus, the ADA has the weapon of potential ostracism from the dental community in its arsenal to coerce plaintiffs and to implement their program.

Furthermore, plaintiffs' decidedly local status does not prevent them from availing themselves of the antitrust laws. *See Lehrman v. Gulf Oil Corp.,* 464 F.2d 26 (5th Cir.), *cert.*

denied, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972). In *Lehrman,* Gulf Oil practiced a price support system throughout the southwestern states. A one-station operator challenged this practice as violative of section 1 of the Sherman Act. On the jurisdictional question, the Fifth Circuit found that the price support network in effect "throughout the Southwest" constituted the applicable "contract, combination, or conspiracy," *id.* at 32, and held that jurisdiction was present in spite of plaintiff's inherently local status. *Cf. Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). *See also, Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948).

with the Sherman Act other than to draw attention to the "public service aspect, and other features" of the profession.[6]

In some respects *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) provides a portion of the additional guidance that is required by the problem of meshing the Sherman Act with proper professional practices. The guidance it supplies consists of the fact that a majority of the *Cantor* court, under the circumstances of the case, refused to immunize from a Sherman Act challenge a prac-

tice of a public utility approved by, and unalterable without the consent of, the state public service commission.[7] According to the plurality, the exemption from the Sherman Act available in *Cantor* extended no further than "was necessary in order to make the regulatory act work, 'and even then only to the minimum extent necessary'." *Id.* 428 at 597, 96 S.Ct. at 3120. Under this test the plurality of four found the practice violative of the Sherman Act and a majority of six Justices agreed with the result.[8] The involvement of the state

**6.** More guidance may be forthcoming. The Supreme Court recently decided to hear a case that challenges disciplinary rules controlling advertising by attorneys on the grounds that they violate the antitrust laws and the First and Fourteenth Amendments. *Bates v. Arizona State Bar*, 555 P.2d 640 (Ariz.Sup.Ct., 1976), *cert. granted*, 429 U.S. 813, 97 S.Ct. 53, 50 L.Ed.2d 73 (1976). The Arizona Supreme Court held that the antitrust attack must fail for three reasons: first, that the control of advertising is distinguishable from the price fixing arrangement in *Goldfarb*; second, that the state bar's actions are exempt as a state action under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); and third, that no legislative body may interfere with the Arizona Supreme Court's reasonable regulation of its integrated bar.

**7.** Pursuant to an order of the Michigan Public Service Commission, Detroit Edison provided light bulbs to its customers for no additional charge. It included, however, the cost of the light bulbs in its operating costs; as a result, the approved rates compensated for this additional cost. Plaintiff contended that the defendant was using its monopoly power in the distribution of electricity to restrain competition in the light bulb market; defendant interposed the defense that conduct required by state law is exempt from the Sherman Act. The plurality held that the conduct might be exempt if the private party had merely followed the command of the state; Detroit Edison, however, had participated in the formulation of that order to such an extent that the Court found that as a private party Detroit Edison had exercised a "sufficient freedom of choice to enable the Court to conclude that he should be held responsible for the consequences of his decision." *Cantor v. Detroit Edison Co.*, 428 U.S. at 594, 96 S.Ct. at 3118. The Court next addressed the question of the propriety of the superimposition of antitrust standards on conduct already being regulated under a different standard. It rejected the simplistic view that the fundamental inconsistency

of the two standards prohibited the application of the antitrust laws. Instead, the Court concluded that the light bulb program was not a necessary element of the regulatory scheme and that it would not be inconsistent to compel the utility to follow antitrust norms in business activities that are outside the realm of its natural monopoly.

**8.** The Supreme Court employed a similar analysis in *Abbott Laboratories v. Portland Retail Druggists Ass'n, Inc.*, 425 U.S. 1, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976). *Abbott Laboratories* involved a determination of the extent to which the Nonprofit Institutions Act exempted certain sales from the application of the Robinson-Patman Antidiscrimination Act. The Nonprofit Institutions Act limits the exemption to "purchases of their supplies for their own use by schools, . . . hospitals, and charitable institutions not operated for profit." The exempt status of the sales by defendant pharmaceutical companies to nonprofit hospitals hinged upon the Court's construction of the phrase "their own use." In construing this phrase, the Court recognized that the Nonprofit Institutions Act creates only a limited exemption; thus, the status of the purchaser as a nonprofit hospital does not entitle defendant sellers to a blanket exemption for all of their sales to such a purchaser. The Court then studied each category of a nonprofit hospital's drug usage to determine whether the conduct was such that it became "a part of and promote[d] the hospital's intended institutional operation in the care of persons who are its patients." *Id.* at 14, 96 S.Ct. at 1314. Therefore, when the hospital used the drugs as a necessary component to its role as a hospital, the Court held that the sale of these drugs to the hospital was exempt from Robinson-Patman; contrariwise, where the hospital's use was unnecessary to its basic function, the Court held that Robinson-Patman was applicable to sales to the hospital of drugs so used. The Court perceived the fundamental inquiry to be the necessity of the use to the functioning of the exempt institution.

through its regulation of the practice afforded no immunity.

*Goldfarb* and *Cantor* make clear that neither an expansive "learned profession" nor equally expansive "state action" exemption exists to shelter the practices being challenged in this case. However, we believe, as already indicated, that the Supreme Court does not require that the practices challenged here be treated the same as would be proper if dentistry were merely a commercial enterprise.[9]

■ As we interpret the Court, to survive a Sherman Act challenge a particular practice, rule, or regulation of a profession, whether rooted in tradition or the pronouncements of its organizations, must serve the purpose for which the profession exists, *viz.* to serve the public. That is, it must contribute directly to improving service to the public. Those which only suppress competition between practitioners will fail to survive the challenge. This interpretation permits a harmonization of the ends that both the professions and the Sherman Act serve.[10]

We recognize this interpretation provides only the principle to be employed in deciding specific cases. It is not a blueprint which will resolve all controversies and by which the professions can check their structures to determine whether they comply with the Sherman Act. Any such blueprint must await additional guidance by the Supreme Court and the resolution of specific cases by this and other courts.

■ At this juncture we can only hold that the arrangements of which the plaintiffs complain are not so obviously designed to improve dental services to the public as to permit us to sustain a motion to dismiss the complaint. A complaint should not be dismissed for failure to state a claim " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. at 746, 96 S.Ct. at 1853, *quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). We cannot say that the complaint fails to meet this modest standard. Further proceedings will provide the defendants the opportunity to demonstrate to the extent possible the manner in which the challenged arrangements promote the improvement of dental services to the public and the plaintiffs the opportunity to show to the extent possible the manner in which they suppress competition between practitioners of dentistry.[11]

REVERSED and REMANDED.

FITZGERALD, District Judge, dissenting:

This action arises from the fact that membership in the American Dental Association is a requirement for membership in the Arizona State Dental Association and the Central Arizona Dental Society. A licensed, practicing dentist in Arizona, such as plaintiffs, cannot belong to the State (ASDA) or local (CADS) society without also tendering dues for membership in the ADA. The ASDA and CADS collect annual ADA membership dues from their members and remit to the ADA. Plaintiffs object to the requirement of paying the ADA dues and complain that it violates sections 1 and 2 of the Sherman Act.

---

9. See the distinction drawn by the Chief Justice Burger between the commercial practices of pharmacists and the professional services of physicians and lawyers in *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 1831, 48 L.Ed.2d 346 (1976).

10. In an exhaustive study of the legislative intent underlying the Sherman Act, Professor Robert H. Bork, the current Solicitor General of the United States, concluded:

"[T]he legislative history, in fact, contains no colorable support for application by courts of

any value, premise or policy other than the maximization of consumer welfare." Bork, *Legislative Intent and the Policy of the Sherman Act,* 9 J.Law & Econ. 7, 10 (1966).

11. The plaintiffs, of course, retain the burden to prove their case-in-chief by a preponderance of the evidence. *See Ramsey v. United Mine Workers,* 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971). *See also, Chisholm Bros. Farm Equip. Co. v. International Harvester Co.,* 498 F.2d 1137 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974).

*Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), makes clear that learned professions, including dentistry, are not beyond the reach of the Sherman Act. In *Goldfarb*, the professional conduct alleged to violate the Sherman Act was price fixing for legal services through use of a minimum fee schedule. The Virginia Bar argued for a wholesale exemption of legal profession activities from antitrust regulation, based on the rationale that competition is inconsistent with the practice of a profession since profit is not the principal goal of professional activities, which is to provide services necessary to the community. Recognizing this as the classic basis advanced to distinguish professions from trades, the Court observed that the rationale loses much of its force when used to support fee control activities. The Court noted that the practice of law as a profession has a business aspect; the exchange of legal services in return for the client's money is "commerce." However, the Court cautioned against automatically applying antitrust concepts from other areas to the professions. The fact that a restraint operates upon a profession as distinguished from a business is relevant in determining whether the particular restraint violates the Sherman Act. 421 U.S. at 787 n.17, 95 S.Ct. 2004.

In sum, I believe that *Goldfarb* narrowly holds that certain "business" or "commercial" activities of professionals are subject to antitrust regulation. Minimum fee schedules are obviously related to the commercial aspect of professional practice. *Goldfarb* instructs that any alleged restraint operating upon a profession should be closely examined in order to determine whether it restrains competition in professional services and thus involves the commercial aspect of professional practice.

The restraint imposed upon the dentists in the present case is simply that unless they belong to the American Dental Association, and pay its membership dues, they may not be members of either the state association or the local dental society. If the dentists fail to pay the ADA dues, they cannot participate in the activities of the state or local groups or attend seminars conducted by the various specialty professional and technical groups and societies in the several states. They may, however, continue to practice dentistry and to charge for these services as they see fit.

It is not alleged that the "restraint" consisting of the dual membership requirement functions to eliminate competition between dentists in providing dental services, or to restrict consumer choice of dental services. By contrast, the price fixing condemned in *Goldfarb* and the other cases[1] relied upon by the dentists are classic conspiracies restraining competition in services, and *per se* violations of the Sherman Act under established antitrust principles.

Moreover, plaintiffs do not claim that the ADA membership requirement is designed for any purpose other than to promote the improvement of dental services. Membership dues paid to the American Dental Association support its nation-wide activities including the administration of dental aptitude tests, the accreditation of dental programs, and the publication and dissemination of professional journals. These activities are obviously designed to benefit the profession and improve the practice of dentistry. To the extent that this may be accomplished, the public is served.

The trial judge, as I understand his ruling, did not hold that learned professions are totally outside the scope of the Sherman Act. Rather he concluded that the particular professional activity at issue, the procedures and requirements for joining professional associations, falls outside the purview of the antitrust laws. I agree. *Goldfarb* does not go as far as to include within the

1. *United States v. Nat'l Soc'y of Professional Eng'rs.*, 389 F.Supp. 1193 (D.D.C.1974) (National Society rules prohibited members from engaging in competitive bidding for engineering services); *United States v. Oregon State Bar*, 385 F.Supp. 507 (D.Ore.1974) (minimum fee schedule); *United States v. Nat'l Ass'n of Real Estate Bds.*, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950) (fixing of real estate commissions); *N. California Pharmaceutical Ass'n v. United States*, 306 F.2d 379 (9th Cir. 1962) (fixing prices of pre-compounded prescription drugs).

scope of the Sherman Act professional activity, such as the ADA membership requirement, which has no alleged purpose or effect of suppressing competition between practitioners.

I would affirm the district court on another ground. Contrary to the majority conclusion, I do not believe the amended complaint alleges a trade restraint substantially affecting interstate commerce.

The amended complaint alleges that the defendant ADA engages in interstate commerce by using interstate communications facilities and by collecting dues from dentists and sending representatives to different states. However, the question is not simply whether the defendant engages in interstate commerce, but whether the alleged restraint substantially affects interstate commerce. The claim here is that the ADA membership requirement somehow restrains plaintiffs' practice of dentistry. Yet plaintiffs do not claim that their dental practices involve interstate commerce. This distinguishes the instant case from *Goldfarb*, wherein the legal services, although performed in state, were an integral part of interstate real estate transactions.[2] 421 U.S. at 784, 95 S.Ct. 2004. The Supreme Court cautioned that there may be legal services that have no nexus with interstate commerce and therefore are beyond the reach of the Sherman Act. 421 U.S. at 785, 95 S.Ct. 2004.

In an attempt to show the requisite impact on interstate commerce, plaintiffs herein allege that they cannot attend out of state seminars conducted by various specialty and technical groups unless they pay the ADA dues. This alleged ineligibility to attend seminars does not amount to sufficient impact on interstate commerce. Significantly, plaintiffs do not even assert a claim for the amounts they have paid in membership dues to the ADA because the cost of

membership is passed on to the public, thereby occasioning no loss to the plaintiffs. I agree with the district court's conclusion that the complaint does not adequately allege a restraint of trade substantially affecting interstate commerce.

I would affirm.

---

2. *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) is also readily distinguishable from the instant case. The complaint in *Rex Hospital* alleged that defendants conspired to block the proposed expansion of plaintiff's hospital facility, and that plaintiff's facility purchased

80% of its supplies from out of state and derived a large share of its insurance revenue and finances from out of state. The alleged conduct of defendants thus adversely affected the very substantial volume of interstate commerce in which the plaintiff's hospital engaged.