**PARALEGAL INSTITUTE, INC., Plaintiff,**

v.

**AMERICAN BAR ASSOCIATION, Defendant.**

**No. 77 C 1478.**

United States District Court, E. D. New York.

Sept. 7, 1979.

Carl E. Person, New York City, for plaintiff.

Simpson, Thacher & Bartlett, Roy L. Reardon, New York City, for defendant.

## MEMORANDUM AND ORDER

GEORGE C. PRATT, District Judge.

### INTRODUCTION

Plaintiff commenced this action on July 18, 1977, alleging that defendants American Bar Association (ABA) and American Telephone & Telegraph Co. (AT&T) violated §§ 1 & 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 in implementing and utilizing certain ABA guidelines and an accreditation program with respect to the training of paralegals. An amended complaint added claims under the New York State Donnelly (Antitrust) Act, New York General Business Law § 340 *et seq.*, and common law claims of interference with a business relationship, unfair competition, and *prima facie* tort. By stipulation of the parties pursuant to FRCP 41(a)(2) AT&T was dismissed from the action on October 20, 1977.

Plaintiff subsequently filed motions seeking (1) preliminary injunctive relief; (2) partial summary judgment as to liability; and (3) if the foregoing were granted, complete summary judgment including a permanent injunction, in consideration of a waiver of damages. The ABA cross-moved for summary judgment. At a conference held before the court, it was agreed that plaintiff would withdraw all claims other than those based upon §§ 1 & 2 of the Sherman Act, and that the court would consider plaintiff's various motions and the ABA's opposition as cross-motions for summary judgment pursuant to FRCP 56.

### NATURE OF THE ACTION

Plaintiff is a New York corporation licensed by the New York State Department of Education, and engaged, since 1972, in the business of recruiting, training and placing paralegals. Plaintiff's place of business is located in New York City. Defendant ABA is a non-profit, unincorporated trade association of attorneys who are licensed to practice law by the respective states of the United States and the District of Columbia. The ABA does not itself have any licensing authority with respect to attorneys or paralegals; however, the ABA Council of the Section of Legal Education and Admissions to the Bar is the only national accrediting entity for the legal profession recognized by the United States Office of Education of the Department of Health, Education, and Welfare, and the private, non-profit Council on Post-Secondary Education. The ABA maintains its national headquarters in Chicago.

Plaintiff claims that the ABA's Guidelines and Procedures for Approval of Legal Assistant Education Programs (Guidelines) and the ABA's paralegal school accreditation program violate the antitrust laws in that they were designed and intended to eliminate competition from, and restrict entry into, the market for the recruitment, training and placement of paralegals, and they are unreasonable when applied to proprietary schools such as plaintiff. The ABA contends that the Guidelines and its accreditation program: (1) have imposed no restrictions on entry into the paralegal training market; (2) do not have any anticompetitive effects on that market; (3) were designed and intended to encourage and facilitate the training and utilization of paralegals; and (4) are reasonable and fairly applied.

## FACTUAL BACKGROUND

### A. *The Paralegal Field*

Paralegals, also known as lay assistants or legal assistants, are nonlawyers who perform "quasi-legal" functions. A paralegal, who may or may not have formal legal training, performs such functions as legal research, office management, preparing and drafting documents, serving and filing papers, searching records, checking titles, etc. In short, paralegals perform some of the services that would ordinarily be rendered by a licensed attorney. The duties of a paralegal may be delegated by an attorney or may be performed independently, as long as such duties do not involve the giving of legal advice or the practice of law, activities in which only a licensed attorney may engage.

The formal growth of the paralegal field is a relatively recent development. By 1970, only four paralegal schools were operating in the United States; as of the time these motions were filed, approximately 224 such schools were in operation throughout the country.

### B. *The ABA and the Paralegal Field*

The ABA's role in the paralegal field dates back to August, 1968, when the ABA Special Committee on the Availability of Legal Services proposed that the ABA House of Delegates, the policy-making arm of the ABA, adopt the following resolution:

> Recognizing that freeing a lawyer from tedious and routine detail thus conserving his time and energy for truly legal problems will enable him to render his professional services to more people, thereby making legal services more fully available to the public, this Committee recommends:
>
> 1. That the legal profession recognize that there are many tasks in serving a client's needs which can be performed by a trained, nonlawyer assistant working under the direction and supervision of a lawyer;
>
> 2. That the profession encourage the training and employment of such assistants;
>
> \* \* \* \* \* \*

Defendant's Ex. 5.

The resolution recommended the creation of a special committee to consider, *inter alia,* the kinds of tasks that might be performed by a paralegal under the direction and supervision of a lawyer; the type of training that might be necessary for a paralegal; the role of the legal profession and the bar in providing such training; and the merits of recognizing competence and proficiency of paralegals through academic recognition or other suitable means. Upon adoption of the resolution, the ABA created the committee which later became the ABA Special Committee on Legal Assistants (ABA Committee).

During the first few years of its existence, the ABA Committee conducted, co-sponsored or participated in a variety of programs to investigate and consider various aspects of the paralegal field: (1) a study to determine the types of tasks that were being performed by lay personnel; (2) a study and conferences to identify the efforts then underway to train paralegals; and (3) a pilot project to train lawyers and paralegals to work productively together. The ABA Committee then published the results of these projects along with a proposed curriculum for paralegal institutions in ABA publications.

During this period many new paralegal training programs surfaced, and the ABA received many inquiries from educators seeking assistance in paralegal program development and from potential students requesting information on the quality of the widely varied programs available. In response to these inquiries, the ABA Committee decided to promulgate minimum standards for educational institutions offering paralegal programs and to develop a system for identifying those institutions which met or exceeded those standards. The ABA Committee hired, as its consultant for this project, an expert qualified in occupational programs generally and legal assistant educational programs specifically. The project resulted in the publication of *The Training and Use of Legal Assistants: A Status Re-*

*port,* which contained a description of the curricula and admission requirements of each institution offering paralegal training.

The ABA Committee then set about developing minimum requirements for paralegal institutions. A tentative draft was written and circulated to over 7,000 persons for review and comment, and a two day conference was held in May, 1973, to consider the issues raised. The proposed standards were then submitted with the ABA Committee's recommendation for adoption to the ABA House of Delegates, where they were adopted in August, 1973, as the Guidelines.

During the year following the adoption of the Guidelines, the ABA Committee solicited the attendance of educators, attorneys and paralegals at several meetings and conferences to discuss the implementation of an evaluation system for the paralegal programs. In September, 1974, the ABA Committee published the Guidelines and the application procedures for institutions seeking ABA approval.

The ABA accreditation process involves the following steps: (1) the applicant institution prepares and submits a self-evaluation report; (2) the ABA Committee checks the report for completeness and compliance with the Guidelines, requesting additional information if necessary; (3) a three member evaluation team (composed of an ABA Committee member, a director from a non-competing paralegal training program, and a practicing paralegal) makes an on-site inspection of the institution; and (4) the ABA Committee members review the report of the on-site inspection team and submit a recommendation to the ABA House of Delegates for final action. The cost to an applying institution is limited to $950 (a $200 application fee plus visitation expenses up to $750). Paralegal institutions seek ABA approval because a program obtaining ABA accreditation is permitted to advertise the fact of its approval in an attempt to recruit new students.

From September, 1974, when the ABA Committee began accepting applications for ABA accreditation, until the time of this motion, a total of 55 institutions had submitted applications. With respect to those applications, 35 programs have been given final approval, no program has been denied accreditation, three institutions have withdrawn their applications, and 17 programs are currently under review or operating with provisional approval. Upon receiving a request for information regarding legal assistant education programs, the ABA Committee provides a list of all known paralegal programs with a designation to indicate institutions that are ABA approved.

## DISCUSSION

### A. *Standing*

The ABA argues that plaintiff lacks standing to sue under the antitrust laws because it never applied for accreditation under the program it now challenges, and because it is unable to prove that its alleged injury is related to the ABA's activities. The ABA relies in part on *Gordon v. New York Stock Exchange, Inc.,* 366 F.Supp. 1261 (SDNY 1973), *aff'd* 498 F.2d 1303 (CA2 1974), *aff'd* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), where the court held that a person who never applied for membership in a stock exchange could not bring suit alleging that such memberships are arbitrarily limited. Plaintiff counters that it is not suing in order to compel accreditation from the ABA, but seeks relief from what it considers to be an illegal conspiracy by the ABA and others to edge out paralegal schools that do not follow the Guidelines, through the coercive granting or withholding of ABA accreditation.

In *Hennessey v. National Collegiate Athletic Assn.,* 564 F.2d 1136 (CA5 1977), the court stated that:

[S]tanding to bring the treble damage anti-trust claim depends upon proof that the plaintiffs (1) suffered injury to their "commercial interests or enterprises" and (2) were in the "target area" of the alleged conspiracy.

*Id.* at 1148.

*See also Nassau County Association of Insurance Agents, Inc. v. Aetna Life & Casu-*

*alty Co.,* 497 F.2d 1151, 1153 (CA2 1974). Another court has stated that:

To have standing to sue the Plaintiff (sic) must sufficiently allege and demonstrate that his *legally cognizable business or property* has been injured as a proximate result of the alleged violation of the antitrust laws.

*Turner v. American Bar Association,* 407 F.Supp. 451, 479 (ND Tex 1975) (emphasis in original).

The ABA admits that plaintiff is within the target area of the alleged conspiracy, but argues that plaintiff has not demonstrated that the ABA's activities are the proximate cause of plaintiff's alleged injuries. In the court's view, plaintiff has made such a showing of injury through the correspondence received by individuals requesting information on whether or not plaintiff received ABA approval. The fact that these potential students specifically requested such information, but did not enroll in plaintiff's school, is not convincing proof of injury due to ABA's activities, but is at least some evidence of the alleged injury. For these reasons the court finds that plaintiff has standing to sue under the antitrust laws.

### B. *Claims Under § 1 of the Sherman Act*

#### 1. *Group Boycott—Per se Illegality*

Plaintiff argues that the activities of the ABA and others involved in the accreditation program, particularly the "approved" paralegal schools, amount to a group boycott, which is a *per se* violation of § 1 of the Sherman Act. *See Silver v. New York Stock Exchange,* 373 U.S. 341, 347, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Klor's Inc. v. Broadway-Hale Stores,* 359 U.S. 207, 211, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originator's Guild v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Plaintiff further contends that the ABA is extending a monopoly power it has in regulating the legal profession to the competing field of paralegals. *See Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 at 275–276 (CA2 1979).

It is clear that the *per se* standard is not applicable here.

The "group boycott" cases typically have involved situations where there was some concerted refusal to deal with persons or companies because of some characteristic of those persons or companies.

*Hennessey v. National Collegiate Athletic Assn., supra,* at 1151.

In the instant matter, not only is there no evidence of a concerted refusal to deal with plaintiff, but there is also no evidence of a boycott. The ABA has corresponded with plaintiff and even invited officials of plaintiff to conferences on paralegal education.

■ The *per se* standard has had limited application in cases of alleged antitrust violations. *See, e. g., Continental TV, Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 50, 59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (CA2 1978). With respect to professions, as opposed to commercial businesses, the *per se* standard has been particularly restricted. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 686, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 788–89 n. 17, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). In *Continental TV, supra,* the Supreme Court stated that:

Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive. * * * "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."

*Continental TV, supra,* 433 U.S. at 50, 97 S.Ct. at 2558, quoting *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

■ The ABA's activities in connection with the paralegal field are not "manifestly anticompetitive", nor are they without any "redeeming virtue". Under the circumstances here, the court holds that the ABA's activities do not amount to a *per se* viola-

tion of the Sherman Act. Plaintiff's antitrust claims must next be considered under the "rule of reason" standard.

### 2. Rule of Reason

█ Section 1 of the Sherman Act provides that:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *.

15 U.S.C. § 1.

In *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Supreme Court limited the Sherman Act to "unreasonable" restraints of trade, thereby spawning the "rule of reason" test. As the Court most recently stated:

Unreasonableness under that test could be based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices. Under either branch of the test, *the inquiry is confined to a consideration of the impact on competitive conditions.*

\* \* \* \* \* \*

[T]he Court has adhered to the position that the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition.

*National Society of Professional Engineers, supra*, 435 U.S. 690–91, 98 S.Ct. 1364–1365 (emphasis supplied).

Thus, this court's inquiry must "[focus] directly on the challenged restraint's impact on competitive conditions." *Id.* at 688, 98 S.Ct. at 1363. *See also North American Soccer League v. National Football League*, 465 F.Supp. 665, 675 (SDNY 1979). In this case, the type of restraint challenged by plaintiff falls, if at all, into the second category alluded to by the Supreme Court: unreasonableness due to surrounding circumstances. This type of restraint "can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was im-

posed." *National Society of Professional Engineers, supra*, 435 U.S. 692, 98 S.Ct. 1365. One court has stated that:

The motive which underlies a challenged restraint is but one element in the examination for reasonableness. * * * Additionally, one should consider the relative positive and negative effects, the power of the parties in the markets they serve, and whether other less restrictive means could be employed to achieve the same desired ends.

*Hennessey v. National Collegiate Athletic Assn., supra*, 564 F.2d 1153.

Were this case one involving simply commercial enterprises, the court could proceed with an analysis of the facts in light of the foregoing principles. However, since the case involves a "learned profession", further comments must precede the factual analysis.

In *Goldfarb v. Virginia State Bar, supra*, the Supreme Court held that there is no unlimited exemption from the Sherman Act for the learned professions. The Court stated:

The nature of an occupation, standing alone, does not provide sanctuary from the Sherman Act * * * nor is the public-service aspect of professional practice controlling in determining whether § 1 includes professions.

*Id.* 421 U.S. at 787, 95 S.Ct. at 2013 (citations omitted).

The *Goldfarb* court held that an attorney's examination of a land title is a service, which, exchanged for money, amounts to "commerce" that falls within § 1 of the Sherman Act. The Court was careful to note, however, that the practices of learned professions should not be analyzed for Sherman Act purposes exactly the way ordinary commercial enterprises are so analyzed:

The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business ac-

tivities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today.

*Id.* at 787–88 n. 17, 95 S.Ct. at 2013 n. 17. In light of the foregoing distinction between learned professions and ordinary commercial enterprises for Sherman Act purposes, one court has stated:

As we interpret the Court, to survive a Sherman Act challenge a particular practice, rule, or regulation of a profession, whether rooted in tradition or the pronouncements of its organizations, must serve the purpose for which the profession exists, *viz.* to serve the public. That is, it must contribute directly to improving service to the public. Those which only suppress competition between practictioners will fail to survive the challenge. This interpretation permits a harmonization of the ends that both the professions and the Sherman Act serve.

We recognize [that] this interpretation provides only the principle to be employed in deciding specific cases. It is not a blueprint which will resolve all controversies and by which the professions can check their structures to determine whether they comply with the Sherman Act. Any such blueprint must await additional guidance by the Supreme Court and the resolution of specific cases * * *.

*Boddicker v. Arizona State Dental Assn.,* 549 F.2d 626, 632 (CA9 1977).

■ Applying the foregoing principles to the undisputed facts, it becomes evident that the ABA Guidelines and accreditation program are reasonable insofar as they affect the paralegal field, and thus do not violate § 1 of the Sherman Act. They are hardly restraints at all. The ABA has shown that the Guidelines and accreditation

program were instituted in response to the burgeoning number of inquiries by educators, lawyers, and the public, on paralegal programs. The ABA has worked with paralegal schools, both proprietary and otherwise, to establish paralegal training programs and standards under which such programs could be evaluated for their quality and effectiveness.

Since the inception of the ABA Guidelines and accreditation program in 1973, the number of paralegal schools in the country has increased, including the number of those in the relevant geographic area for the purposes of this case, New York City plus a 100 mile radius. Plaintiff's argument that the rate of increase has slowed can be easily explained as stemming from approaching saturation of the relevant market. While there were two paralegal schools operating in New York and its environs in 1972, there are now 17 such schools.

The court is satisfied that the accreditation program does not impose any unreasonable burdens on paralegal schools. The fact of ABA approval alone does not favor certain schools over others; all schools are eligible to apply. Nor does the absence of such approval bar a school from operating; the actual regulation of such schools is left to the education departments of each state. Moreover, the Guidelines are reasonable. They contain mere minimum standards, which are not imposed on any school but provide guidance and assistance in operating a paralegal program.

Furthermore, there is no indication from the undisputed facts that the ABA intends to "control" the paralegal field through its Guidelines and accreditation program. Plaintiff's quoted excerpts from ABA documents and transcripts of speeches to this effect do not prove such intent. The quotations were either taken out of context, or were not made by the policy-making arm of the ABA, the House of Delegates or by the ABA Committee. When read in context, the various statements advanced by plaintiff to show an intent to monopolize the paralegal field, merely indicate the ABA's concern with the training and placement of

paralegals and its desire to establish minimum standards to serve as guidelines for those engaged in operating paralegal schools.

Finally, cases involving other regulatory practices by professional organizations are distinguishable: *Goldfarb* held that a state bar association's rule prescribing minimum fees for legal services was unconstitutional; *National Society of Professional Engineers* held that the engineers' canon of ethics prohibiting competitive bidding was unreasonable and thus violated § 1 of the Sherman Act. In each of those two cases, the rule that was challenged was more mandatory than the Guidelines and accreditation program challenged here. In *Hennessey v. National Collegiate Athletic Assn.,* the court held that an association by-law limiting the number of coaches employable by a university was a reasonable restriction in light of the background and effect of the by-law and the history and motives of the association.

It is evident from the foregoing that the ABA Guidelines and accreditation program do not amount to an unreasonable restriction on the paralegal field.

## C. *Claims Under § 2 of the Sherman Act*

Section 2 of the Sherman Act provides that:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *.

15 U.S.C. § 2.

Plaintiff alleges here that the ABA, in implementing the Guidelines and the accreditation program, is liable under § 2 for illegal monopolization, attempt to monopolize, and conspiracy to monopolize.

### 1. *Monopolization*

■ In *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), the Supreme Court defined a monopoly offense as comprising two elements:

"(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 570–71, 86 S.Ct. at 1704. The Court has further stated that monopoly power is "the power to control prices or exclude competition." *United States v. E. I. Du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956).

Plaintiff argues that the ABA, by implementing the Guidelines and its accrediting program, is monopolizing the paralegal field, an activity proscribed by § 2 of the Sherman Act. Alternatively, plaintiff contends that the ABA is using its monopoly in the market for attorneys as a lever to control the market for paralegals. *See Berkey Photo, Inc. v. Eastman Kodak Co., supra.* The facts presented, however, do not support plaintiff's contention.

■ An analysis of the effect of the ABA's program of accrediting paralegal training institutions on the paralegal training market gives no indication of controlled prices, inhibited growth or excluded competition. In fact, when the ABA's accreditation program was instituted in 1973, there were approximately 37 paralegal training programs throughout the United States; by February of 1978, there were approximately 224 such programs nationwide. In the New York market area (New York City plus a 100 mile radius), where three paralegal institutions operated in 1972, 17 such institutions are currently operating. Contrary to plaintiff's contentions, the ABA accreditation program appears to have had a positive effect on competition in the paralegal training market.

Moreover, it cannot be said that the ABA, as a professional public service organization, monopolizes the delivery of legal services in the United States. Even assuming, *arguendo,* that plaintiff's allegations with respect to the market for attorneys is valid, plaintiff has set forth no facts that suggest anything approaching a leverage-type control of the paralegal market.

The ABA's activities in the paralegal field do not, by any stretch of the imagination, provide "the power to control prices or exclude competition." The court is satisfied that the flexible ABA accreditation process, which has resulted in the approval of institutions with widely varied program offerings, has served to stimulate, rather than exclude, competition.

It is interesting to note that the courts have given the accreditation process for educational institutions a somewhat favored status under the antitrust laws. In *Marjorie Webster Jr. College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc.*, 139 U.S.App.D.C. 217, 432 F.2d 650 (CA DC), *cert denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970), the court, dealing with an accrediting program for education institutions, held that

> the proscriptions of the Sherman Act were "tailored * * * for the business world," not for the noncommercial aspects of the liberal arts and the learned professions. In these contexts, an incidental restraint of trade, absent an intent or purpose to affect the commercial aspects of the profession, is not sufficient to warrant application of the antitrust laws.
>
> * * * It is possible to conceive of restrictions on eligibility for accreditation that could have little other than a commercial motive; and as such, antitrust policy would presumably be applicable. Absent such motives, however, the process of accreditation is an activity distinct from the sphere of commerce; * * * We do not believe that Congress intended this concept to be molded by the policies underlying the Sherman Act.

*Id.* at 654–55, quoting *Eastern R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 141, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

The court notes, in passing, that from all indications the ABA's interests are best served by fostering the growth of the paralegal market, so that ABA members can more easily hire the necessary legal assistants from a large pool of skilled persons. Plaintiff offers, and the court can decifer,

no rationale for the ABA to even contemplate monopolistic activity in the paralegal field. Any artificial limitation on the number of acceptably trained legal assistants would, according to the principles of supply and demand, serve only to raise the cost of such services to the legal profession. In short, plaintiff's accusations of monopolization are not only factually unfounded, they are also unappealing both logically and practically, and summary judgment is granted to defendant on this issue.

### 2. Attempt to Monopolize

■ The essential elements of an attempt to monopolize are that the defendant have (1) the specific intent to monopolize the relevant market, *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), and (2) sufficient market power to create a "dangerous probability" of success, *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905). Since the plaintiff must show specific intent in order to prove attempt to monopolize under § 2 of the Sherman Act, and since the court is satisfied that the ABA harbored no specific intent to monopolize, see discussion of intent with respect to Sherman § 1 claims above, it is not necessary to determine the issues relating to the relevant market or the degree of defendant's power in that market. Summary judgment is therefore granted to defendant on plaintiff's claim of attempting to monopolize.

### 3. Conspiracy to Monopolize

■ It is a separate offense under § 2 of the Sherman Act for two or more persons to conspire to monopolize. The elements of the offense are (1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy. *See Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 465, 41 S.Ct. 172, 65 L.Ed. 349 (1921). For this offense, it need not be shown that monopoly power has been, or might be, achieved. It must be

shown, however, that the defendant had specific intent to monopolize. Since the court is satisfied that the ABA did not intend to monopolize the paralegal field, plaintiff's claim of conspiracy to monopolize cannot stand.

Moreover, there is no evidence in the documents before the court that the ABA conspired or combined with anyone to accomplish a plan of monopolization. The only indication of the purported conspiracy alleged by plaintiff is that the plaintiff's competitors applied for and received ABA accreditation. This fact, standing alone, does not show any "meeting of the minds" to accomplish a monopolistic purpose, particularly when plaintiff has refused even to seek accreditation.

For these reasons, plaintiff's motion for summary judgment on the issue of conspiracy to monopolize is denied, and defendant's motion with respect thereto is granted.

### CONCLUSION

For the above reasons, plaintiff's motion for summary judgment is denied in all respects and defendant's motion for summary judgment is granted in all respects, and the complaint is dismissed. The Clerk shall enter judgment accordingly.

SO ORDERED.